644 F.2d 820
 7 Media L. Rep. 1399
 NATIONAL SUBSCRIPTION TELEVISION, and Oak Broadcasting
Systems, Inc., Plaintiffs-Appellants,
v.
S & H TV, JKL Electronics, Jon Karl Larson, R & R
Associates, Richard L. Rathburn, Richard Rath, JK
Electronics, Jacqueline M. Kennedy, Kenneth J. Kennedy, SCR
Electronics, Stephen Robbins, J & R Electronics, V.
DeFrancisco, Video Movie House, Rich Minard, and Maury
Goldstein, Defendants-Appellees.
 No. 80-5655.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 9, 1981.
Decided May 7, 1981.
 
 Patrick Lynch, O'Melveny & Myers, Los Angeles, Cal., argued for plaintiffs-appellants; William Wewer, Wewer & Mahn, P. C., Washington, D. C., on brief.
 Kenneth J. Golden, Westminster, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before TRASK and SCHROEDER, Circuit Judges, and CARROLL,* District Judge.
 TRASK, Circuit Judge:
 
 
 1
 Appellants, owners and operators of a subscription television service, seek review of the district court's dismissal of their complaint brought under section 605 of the Federal Communications Act, 47 U.S.C. § 605. The district court dismissed the complaint because it found that appellants' transmissions are not protected by the statute. We reverse.
 
 
 2
 * Appellant National Subscription Television (NST) owns a subscription television (STV) service marketed under the name of "ON-TV." Appellant Oak Broadcasting Systems, Inc. is licensed to broadcast television signals in the Los Angeles area over UHF Channel 52. During certain hours of every day, Oak Broadcasting leases its transmission facilities to NST for use in transmitting ON-TV programs. NST transmits an encoded visual signal which is received in scrambled form by every television set in the area. Reception adequate for viewing, however, is obtained only by sets equipped with special decoding devices which are leased by NST to paying subscribers. The audio signal is transmitted on a special sub-frequency carrier and is received only by individuals who have special NST equipment. The decoders enable NST to monitor viewing of its programs and to generate monthly billings for subscribers.
 
 
 3
 Appellees are makers and distributors of decoding devices, not authorized by NST, which enable a television set to unscramble the NST visual signal and receive the NST audio signal. Use of one of appellees' devices enables a viewer to watch NST programming without paying any subscription fees.
 
 
 4
 NST and Oak Broadcasting filed a claim against appellees for injunctive and damage relief pursuant to section 605 of the Federal Communications Act (the Act), 47 U.S.C. § 605, which generally prohibits the unauthorized interception and divulging, or aid thereto, of radio communications.[1] They also filed various state claims. The district court dismissed the section 605 claim under Fed.R.Civ.P. 12(b)(6). In its view, NST's signals were unprotected by 605 by virtue of the proviso to that section: "This section (605) shall not apply to the receiving, divulging, publishing or utilizing the contents of any radio communication which is broadcast or transmitted by amateurs or others for the use of the general public, or which relates to ships in distress."
 
 II
 
 5
 In support of their motion to dismiss, appellees alleged that NST's programming is of interest to a mass audience, and that its signal delivery system is capable of reaching such an audience. These allegations were admitted by appellants in their opposition to appellees' motion. Appellees contend that the mass audience appeal of NST's programming and the ability of its signal delivery system to reach mass audiences mean that appellants broadcast within the meaning of section 153(o), which defines "broadcasting" as "the dissemination of radio communications intended to be received by the public." 47 U.S.C. § 153(o). They further argue that all section 153(o) broadcasting is within the reach of the proviso, and, therefore, is unprotected by the general prohibitions against signal interception contained in section 605. The district court based its dismissal of appellants' complaint on this argument.
 
 
 6
 Conversely, appellants contend that NST's efforts to restrict reception of its signal to paying subscribers negate a finding of section 153(o) intent. They argue that NST does not broadcast within the meaning of section 153(o) and the proviso, and that its signal is thus protected by section 605.
 
 
 7
 "(A) complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957) (footnote omitted); accord Experimental Engineering, Inc. v. United Technologies Corp., 614 F.2d 1244, 1246 (9th Cir. 1980); 2A Moore's Fed.Prac. para. 12.08, at 2271, 2275 (2d ed. 1980). The issue before us, then, is whether appellants' signals are "broadcast ... for the use of the general public" within the meaning of the proviso to section 605. If so, then as a matter of law appellants cannot avail themselves of the protections contained in section 605, and dismissal of their complaint under Rule 12 was proper.
 
 III
 
 8
 The legislative history of section 605 does not speak to the question whether the section protects transmissions such as NST's, and caselaw on the applicability of the section to radio and television subscription services is sparse. The first reported decision on the issue is KMLA Broadcasting Corp. v. 20th Century Cigarette Vendors Corp., 264 F.Supp. 35 (C.D.Cal.1967). As part of a promotional campaign, 20th Century had given to some of its clients equipment which enabled them to receive KMLA's background music service without paying for it. KMLA sued for relief under section 605. The court held that KMLA's service was not section 153(o) broadcasting and did not fall within the proviso, but was instead private, point-to-point communication protected by the general prohibitions of section 605. 264 F.Supp. at 42. The court based this holding on KMLA's lack of intent to transmit its subscription signal to the general public, id. at 40-41, as evidenced by the existence of the special receiving devices needed to receive KMLA's signal, id. at 42.[2]
 
 
 9
 KMLA was cited with approval by Home Box Office (HBO), Inc. v. Pay TV of Greater New York, 467 F.Supp. 525 (E.D.N.Y. 1979), which held that STV signals transmitted by a "multi-point distribution service" (MDS)[3] are protected against interception by section 605. Id. at 528. This case is of limited authority, however, because the defendant there did not argue that the proviso removed the signal from the protection of section 605. See id.
 
 
 10
 In Orth-O-Vision, Inc. v. Home Box Office (HBO), 474 F.Supp. 672 (S.D.N.Y.1979), HBO sought to enjoin interception of its MDS signal by Orth-O-Vision, an unauthorized receiver-converter. HBO filed suit pursuant to numerous statutes, including section 605, and immediately moved for summary judgment on its 605 claim. The court discounted the significance of the need for special equipment to receive the HBO signal, and focused on the nature of the programming and the capabilities of the signal delivery system. 474 F.Supp. at 682. The court ultimately denied HBO's motion, concluding that the evidence did not indisputably show either that HBO programming was not of interest to a mass audience,[4] or that an MDS system was incapable of delivering the signal to such an audience. Id.
 
 
 11
 The Orth-O-Vision opinion relies for its result on two prior cases, Functional Music, Inc. v. FCC, 274 F.2d 543 (D.C. Cir. 1958), cert. denied, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 81 (1959), and In the Matter of Amendment of Part 73 of the Commission's Rules and Regulations (Radio Broadcast Services) to Provide for Subscription Television Service, 3 F.C.C.2d 1 (1966) (hereinafter cited as In re Amendment of Part 73 ). In Functional Music, Inc. v. FCC, supra, a radio station sought review of an FCC determination that the station's subscription music service was not 153(o) broadcasting, and thus was not properly disseminated by a general broadcasting licensee. Subscribers received the same musical programming as that transmitted by the station to the public-at-large, but were also given special equipment which enabled them to delete all advertising and promotional material from the transmissions. The court reversed the FCC's determination:
 
 
 12
 (P)rogram specialization and/or control is not necessarily determinative of (section 153(o)) intent .... Broadcasting remains broadcasting even though a segment of those capable of receiving the broadcast signal are equipped to delete a portion of that signal. (F)unctional programming can be, and is, of interest to the general radio audience.
 
 
 13
 274 F.2d at 548 (emphasis in original).
 
 
 14
 In In re Amendment of Part 73, supra, the FCC held that STV transmitting constitutes broadcasting within the meaning of section 153(o),and, therefore, is properly transmitted by an FCC broadcasting licensee. 3 F.C.C.2d at 8-10. The commission rejected the argument that restriction of signal reception to those willing to pay the transmitter is not 153(o) broadcasting:
 
 
 15
 The evident intention of any station transmitting subscription programs would be to make them available to all members of the public within range of the station .... (T)he primary touchstone of a broadcast service is the intent of the broadcaster to provide radio or television service without discrimination to as many members of the general public as can be interested in the particular program as distinguished from a point-to-point message service to specified individuals .... "(I)ntent" may be inferred from the circumstances under which material is transmitted, and the number of actual or potential viewers is not especially important.
 
 
 16
 Id. at 9.
 
 
 17
 The most recent decision in this area is Chartwell Communications Group v. Westbrook, 637 F.2d 459 (6th Cir. 1980) and United States v. Westbrook, 502 F.Supp. 588 (E.D.Mich. 1980). On facts identical to those in the case before us, the court there held that STV is not broadcast for the use of the general public within the language of the proviso and, therefore, is protected by section 605. 637 F.2d at 465-67, 502 F.Supp. at 590-92.
 
 IV
 
 18
 Appellees argue that programming appeal and signal delivery capabilities, which control the determination whether a transmission is 153(o) broadcasting, see Functional Music, Inc. v. FCC, supra; In re Amendment of Part 73, supra, are also the factors that determine whether a transmission falls within the proviso. See Orth-O-Vision, Inc. v. HBO, supra, 474 F.Supp. at 682. It is true that the analytical premise of some of the cases dealing with sections 153(o) and 605 is that transmissions that constitute broadcasting within the meaning of 153(o) fall within the proviso to 605, and, therefore, are unprotected, whereas transmissions that do not amount to 153(o) broadcasting are out of the proviso's reach, and thus are protected by 605. Compare Orth-O-Vision, Inc. v. HBO, supra, 474 F.Supp. at 680 with KMLA Broadcasting Corp. v. 20th Century Cigarette Vendors Corp., supra, 264 F.Supp. at 41-42 and HBO, Inc. v. Pay TV of Greater New York, supra, 467 F.Supp. at 528. But see Chartwell Communications Group v. Westbrook, supra, 637 F.2d at 465-67. Appellants do not dispute the validity of this premise, but urge instead that we overrule or limit the FCC's determination in In re Amendment of Part 73, supra, that STV transmissions constitute 153(o) broadcasting. Cf. Functional Music, Inc. v. FCC, supra (overruling FCC determination that subscription radio service did not constitute broadcasting).
 
 
 19
 We find it unnecessary to review the FCC determination because we conclude that section 153(o) does not control the reach of the proviso. See Chartwell Communications Group v. Westbrook, supra, 637 F.2d at 464-65. The proviso does not remove all broadcasting from the protection of section 605, but only communications broadcast "for the use of the general public." See 47 U.S.C. § 605. We think that an individual might "broadcast" i. e., transmit a signal over the airwaves with the intent that it be received by the public within the meaning of section 153(o) without such broadcasting being for the use of the public within the meaning of the proviso. For example, the operator of an STV service offers his product to any member of the public willing to pay the subscription price. Like any entrepreneur, the STV operator hopes that his product becomes popular and is subscribed to by most, if not all, of the public. Thus, the programming of STV is calculated to attract the largest possible audience, and the method of transmitting STV is premised on being able to accommodate widespread demand. It is in this sense that STV is "intended to be received by the public" i. e., "broadcast" under section 153(o). See generally In re Amendment of Part 73, supra. See also Functional Music, Inc. v. FCC, supra.
 
 
 20
 Nevertheless, it does not follow that STV is "broadcast ... for the use of the general public" within the meaning of the proviso. Indeed, the manner in which STV operators such as NST attempt to control their signals suggests the opposite. The visual signal is useless and the audio signal not receivable without special equipment supplied by the operator. Moreover, without the capability of monitoring program viewing through use of such equipment, it is doubtful that any STV operation can survive as a viable commercial enterprise. We conclude, therefore, that STV operators such as NST broadcast their programming, not for the use of anyone who is somehow able to receive their signals, but only for the use of paying subscribers. Chartwell Communications Group v. Westbrook, supra, 637 F.2d at 465-67 (relying in part on FCC Staff Report on Policies for Regulation of Direct Broadcast Satellites 124 n.17 (Sept. 1980) (hereinafter cited as FCC Staff Report)[5]); cf. KMLA Broadcasting Corp. v. 20th Century Cigarette Vendors Corp., supra, 264 F.Supp. at 42 (use of special receiving equipment evidences radio broadcaster's intent to broadcast for use of subscribers only). We reject the reasoning of Orth-O-Vision, Inc. v. HBO, supra, to the extent that it is inconsistent with this holding.
 
 
 21
 Appellees contend that distinguishing between signals "intended to be received by the public" and signals "broadcast ... for the use of the general public" misconstrues the language of the proviso. They argue that "broadcast" as used in the proviso stands alone, the phrase "for the use of the general public" modifying only "transmitted," and not "broadcast." As support for this conclusion, appellees substitute for "broadcast" in the proviso the statutory definition of broadcasting contained in section 153(o). The proviso then becomes an exemption from section 605 of communications "intended to be received by the public ... for the use of the general public." Appellees argue that such language is redundant, and violates the principle of statutory construction that holds that a statute should be construed so as to avoid redundancy.
 
 
 22
 Appellees cite no authority in support of their asserted construction of the proviso, and, in fact, the cases have assumed the opposite construction. See, e. g., Chartwell Communications Group v. Westbrook, supra, 637 F.2d at 466-67; Orth-O-Vision, Inc. v. HBO, supra, 474 F.Supp. at 680-81; HBO, Inc. v. Pay TV of Greater New York, supra, 467 F.Supp. at 528. See also United States v. Fuller, 202 F.Supp. 356, 358 (N.D.Cal.1962). We do not find that redundancy results from construing the phrases to modify the word "broadcast." Although substitution of the section 153(o) definition in place of "broadcasting" in the proviso yields language that is somewhat inelegant, such language nevertheless conveys the "important distinction between making a service available to the general public and intending a program for the use of the general public," Chartwell Communications Group v. Westbrook, supra, 637 F.2d at 465.
 
 
 23
 We note that protection under section 605 of STV transmissions such as NST's promotes express FCC policies.[6] The FCC has determined that STV constitutes an alternative media communications system which promotes the public interest. FCC Staff Report, supra, at 123 n.15. See generally Connecticut Committee Against Pay TV v. FCC, 301 F.2d 835, 836 (D.C.Cir.), cert. denied, 371 U.S. 816, 83 S.Ct. 28, 9 L.Ed.2d 57 (1962). Appellees' activities threaten the economic viability of the STV industry, and thus run counter to FCC policy and the public interest. Specifically, the inability of STV operations to control public viewing of their signals reduces their income, which in turn prevents them from obtaining attractive programs to transmit on their systems and discourages the investment of capital in STV enterprises.
 
 
 24
 Appellees' actions also run counter to an FCC consumer protection policy. FCC regulations require that STV operations lease (rather than sell) decoders to subscribers. Over-the-Air Subscription Television Operations Licensing Policies, 47 C.F.R. § 73.642(f)(3) (Oct. 1, 1979).[7] Appellees' sales of unauthorized decoders implicate this policy no less than would sales of authorized decoders by NST itself.
 
 
 25
 Appellees, on the other hand, advance several justifications for leaving STV signals unprotected. First, they argue that the airwaves belong to the public, and that an entity such as NST should not be granted monopoly control of a particular frequency without the express approval of Congress. As an FCC licensee, however, Oak Broadcasting already has the right to prevent others from broadcasting on its frequency. Furthermore, granting section 605 protection to NST's signals does not grant NST a monopoly, because it does not prevent other STV or pay-television operations from entering and competing in the Los Angeles pay-television market. Finally, although the public owns the airwaves, Congress and the FCC are charged with regulating them in the public interest. That interest would seemingly not be served by the demise of a product for which there is clearly considerable consumer demand.
 
 
 26
 Second, appellees speculate that Congress intended that STV operations protect themselves by technology. The appellees offer no authority in support of this reading of congressional intent, and we are not persuaded by it. On the contrary, we note that even the most technologically sophisticated decoder can be copied by processes of reverse engineering.
 
 
 27
 Finally, appellees argue that their actions provide needed competition to NST in the manufacture of decoders. This argument proves too much. Appellees' competitive success would result not merely in subscribers' acquiring decoders from them instead of NST, but would prevent NST from operating as an economically viable enterprise and eventually force it out of business. This would eliminate the reason for acquiring a decoder in the first place.
 
 
 28
 We hold that the broadcasting of NST in the case before us does not constitute "broadcasting ... for the use of the general public" within the meaning of the proviso to section 605 of the Act. Accordingly, appellants' signals are protected by section 605, and they have pled a complaint upon which relief may be granted. Thus, the district court's dismissal of appellants' complaint under Rule 12 was error.
 
 V
 
 29
 Appellees contend that even if we are to find that NST's signals are protected by section 605, we must nevertheless affirm the district court's dismissal of appellants' complaint because appellees' actions do not constitute a violation of the statute. Appellees correctly state that to be held liable for a violation of section 605, a defendant must be shown to have (1) intercepted or aided the interception of, and (2) divulged or published, or aided the divulging or publishing of, a communication transmitted by the plaintiff. See, e. g., United States v. Butenko, 494 F.2d 593, 599-600 (3d Cir.) (en banc), cert. denied, 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974); Reston v. FCC, 492 F.Supp. 697, 704 n.4 (D.D.C.1980) (quoting Bufalino v. Michigan Bell Telephone Co., 404 F.2d 1023, 1027 (6th Cir. 1968), cert. denied, 394 U.S. 987, 89 S.Ct. 1468, 22 L.Ed.2d 763 (1969)); United States v. Fuller, supra, 202 F.Supp. at 358. Appellees argue that they neither intercepted nor aided interception of a signal, because the signal is already received by all television sets in the Los Angeles area, albeit in scrambled form. They also argue that they neither divulged nor published the NST signals, nor aided anyone in doing so.
 
 
 30
 This argument has no merit. Appellees' activities clearly "are assisting third parties in receiving communications to which they are not entitled." See Chartwell Communications Group v. Westbrook, supra, 637 F.2d at 466. Even if, technically speaking, appellees did not aid interception of NST's visual signal, it cannot be denied that their actions aided interception of the audio signal. It is likewise clear that there was divulgement or publication. The act of viewing an NST program on a television set equipped with an unauthorized decoder amounts to disclosure of the "existence, contents, substance, purport, effect, or meaning" of NST's signals to nonsubscribers. See 47 U.S.C. § 605. Appellees do not allege that the persons to whom decoders were sold do not use them.
 
 
 31
 Therefore, the district court's dismissal of appellant's complaint is REVERSED, and the case REMANDED for further proceedings consistent with this opinion.
 
 
 
 *
 Honorable Earl H. Carroll, United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 Section 605 reads in relevant part: "No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person." 47 U.S.C. § 605. "Radio communication" as used in the Act has been construed to include television transmissions. See, e. g., Allen B. DuMont Laboratories v. Carroll, 184 F.2d 153, 155 (3d Cir. 1950), cert. denied, 340 U.S. 929, 71 S.Ct. 490, 95 L.Ed. 670 (1951). The courts have long recognized the existence of a private right of action under section 605. E. g., Reitmeister v. Reitmeister, 162 F.2d 691, 694 (2d Cir. 1947); see Chartwell Communications Group v. Westbrook, 637 F.2d 459, 466 & n.5 (6th Cir. 1980); Orth-O-Vision, Inc. v. Home Box Office (HBO), 474 F.Supp. 672, 681 & n.8 (S.D.N.Y.1979)
 
 
 [2]
 The court also relied on its determination that the service was a "special interest" transmission excluded by the FCC from section 153(o), because only stores, restaurants, offices and the like would be interested in the service, and on its observation that a different regulatory scheme existed for subscription services than for additional radio broadcasting
 
 
 [3]
 This kind of transmission system transmits the television signal on a microwave frequency to various fixed receivers, which then convert the signal to a standard frequency and feed it by cable to paying subscribers
 
 
 [4]
 On the contrary, the court concluded that the evidence showed HBO programming to have been designed to appeal to just such an audience. 474 F.Supp. at 682
 
 
 [5]
 Note 17 reads in relevant part:
 In reaching its conclusion (in In re Amendment of Part 73, supra,) that STV is broadcasting, the Commission stated that it regarded a (broadcasting) licensee's "intent to provide a radio or television service without discrimination to as many members of the general public as can be interested in the programs" as of primary importance to its determination. However, this conclusion appears to ignore the fact that, although a licensee's overall service (including adaptor, decoder, or converter) may be offered to the public generally, nevertheless, his actual radio transmissions, by themselves, may not be intended for general public reception. Moreover, a determination as to the latter issue would appear to be relevant to the applicability of Section 605 of the Act, and the Commission has not directly addressed the status of STV under this statutory provision.... Based upon its recognition of their "point-to-point" service characteristics, the Commission has concluded that FM radio and MDS subscription programming services are within the purview of Section 605. It also seems clear that there is no distinguishing factor that would justify the exclusion of STV programming, but not the subscription programming transmitted by other licensees, from the protection afforded by Section 605. For example, it is apparent that the conduct of FM subscription radio transmissions is not more "private" than STV transmissions and is not for that reason more entitled to Section 605 protection. Although many types of subscription radio services are highly specialized, they are not inherently confidential in nature. Indeed, as one court has noted, Section 605 was intended to protect persons from having their communications received by those not entitled to receive them, and STV operators can only operate their businesses if they can restrict viewers to paying subscribers.
 (Emphasis in original and citations omitted.)
 
 
 [6]
 Appellees cite language from Cable Vision, Inc. v. KUTV, Inc., 335 F.2d 348 (9th Cir. 1964), cert. denied, 379 U.S. 989, 85 S.Ct. 700, 13 L.Ed.2d 609 (1965), for the proposition that policy considerations should not determine whether NST's transmissions are protected by section 605:
 (T)he courts are not charged by our constitutional system as arbiters of good policy. That function is reserved to Congress. In short, while it makes an appealing picture to see courts and administrative agencies hand in hand redeeming national communications policy, the fact remains that it is not the proper function of courts to do so.
 Id. at 353 (footnote omitted).
 It is true that in our system of government the policy-making role is committed to Congress and not to the courts. Nevertheless, judges are not unmindful of the effects of their decisions and, although policy considerations are not determinative of the proper resolution of a legal issue, neither are they irrelevant to such resolution. Certainly we are not required to thwart legislative or regulatory policies already formulated by other branches of the government when, as here, a decision supporting such policies is consistent with the statutory scheme.
 
 
 [7]
 The rationale is that subscribers are thereby protected from the danger of investing a large sum of money in a device which is likely to become technologically obsolete in a relatively short period of time. Another justification for the policy is that leasing gives consumers added flexibility and encourages competition among STV companies. Under typical leasing arrangements, a subscriber may cancel his STV service at any time at no cost to himself. When decoders have been purchased, however, it is thought that the large sunk cost that they represent might deter such action. Because decoders are not interchangeable between systems, the consumer who has purchased a decoder might consider himself "locked-in" to one STV system because of the purchase. (This, however, is contrary to contemporary economic theory, which maintains that current consumption choices are unaffected by sunk costs.) See generally Kelman, Consumption Theory, Production Theory, and Ideology in the Coase Theorem, 52 S.Cal.L.Rev. 669, 691-93 (1979)