**CALIFORNIA SATELLITE SYSTEMS,**
Plaintiff/Appellee,

v.

**John J. SEIMON, et al., Defendants,**

and

**Daniel Benvenuti, Defendant/Appellant.**

No. 84–2449.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 9, 1985.

Decided Aug. 8, 1985.

Roger Stewart, Weintraub, Genshlea, Hardy, Erich & Brown, Sacramento, Cal., for plaintiff/appellee.

N. Kerry Rowan, Belli, Shepherd & Belli, Sacramento, Cal., for defendant/appellant.

Before FERGUSON, NORRIS and WIGGINS, Circuit Judges.

FERGUSON, Circuit Judge:

Defendant Daniel Benvenuti appeals from the district court's injunction prohibiting the defendant from pirating the plaintiff's radio transmissions of subscription home television entertainment programming. In 1980, defendant Benvenuti purchased microwave receiving equipment which he then had installed on his roof to intercept the plaintiff's microwave transmissions of programs for television viewing. Plaintiff brought suit to prevent the pirating of its signal. After a trial, the district court found the defendant's unauthorized interception and use of the plaintiff's signals violated section 605 of the Federal Communications Act of 1934. The district court enjoined future violations of the Act, and entered an affirmative injunction against the defendant to remove the offending equipment from his roof. On appeal the defendant challenges the applicability of section 605 of title 47 to his conduct and contends that the removal violates his First Amendment rights. We affirm.

FACTS

The plaintiff, California Satellite Systems ("CALSAT"), is a California corporation operating in the vicinity of Sacramento. CALSAT provides a subscription entertainment system for Sacramento residents in which uncut movies, sports events and other programs are displayed on subscribers' television sets. CALSAT pays the program originators (Home Box Office, Movie Vision, and ON TV) a monthly fee to receive entertainment programming from an earth-to-satellite-to-earth communication network from Home Box Office's New York headquarters or ON TV's Salt Lake City offices. For HBO programs, the chain of communication begins in New York, where a microwave radio signal is beamed to an RCA satellite, returned to Sacramento, where a common-carrier company, Sacramento Microband, then retransmits the microwave signal to CALSAT subscribers. CALSAT purchases the programming and pays for Sacramento Microband's common-carrier service out of subscription revenues from individual subscribers. This type of common-carrier service has been licensed by the FCC since 1974 and is known as a Multipoint Distribution Service ("MDS") appearing at an FCC-assigned frequency of 2150 to 2156 megaherz.

The MDS communications system operates on a high frequency signal which cannot be received by a standard television set without the aid of three separate devices: a special antenna capable of receiving such high frequency signals, a "downconverter" capable of lowering the microwave frequency to a level receivable by a television set, and a power supply to transmit the signal from antenna to television receiver. CALSAT installs the equipment, retaining title in itself, and maintains the system for a monthly subscription fee. Reception of the MDS signal requires accurate positioning of the microwave antenna on the roof of a subscriber's residence in a direct line of sight with the common carrier's transmitter. CALSAT does not scramble its signal to prevent piracy like other subscription television services which use common television frequencies for program distribution.

The defendant is a Sacramento resident who purchased microwave receiving equipment in 1980. The equipment was installed by the seller in a direct line of sight aimed at Microband's transmitter. Thereafter, the defendant and his stepson watched CALSAT's programming without payment of the monthly subscription fees. According to the district court, the market availability of such private residence MDS reception systems began in 1978, shortly af-

ter the MDS programmers extended their services to single-family residences. The defendant admits that he watched CAL-SAT's programming without payment of the subscription fees for some time. The defendant contends, however, that he disconnected his television set from the antenna in order to prevent his stepson from watching some of the adult entertainment programming. The district court found that the equipment "was used solely to receive plaintiff's pay television programming" and "was put to no other use" from 1980 until the latter part of 1982 or early 1983.

STANDARDS OF REVIEW

The district court's conclusions of law are reviewed de novo, *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), while its findings of fact are subject to the clearly erroneous standard of review. Fed.R. Civ.P. 52(a).

ISSUES

1. Did the district court err in concluding that the defendant's unauthorized reception of plaintiff's microwave transmission violated 47 U.S.C. § 605?

2. Does the injunction violate the First Amendment rights of the defendant?

I.

 Section 605 of title 47, now recodified as section 705 of that title,[1] was enacted as part of the Federal Communications Act of 1934 and prohibits the unauthorized publication or use of radio communications. Enacted in 1934, section 605 was aimed at preventing the unauthorized use of radio

signals by those authorized to transmit these signals as well as those not involved in authorized transmission. *See Home Box Office v. Advanced Consumer Technology*, 549 F.Supp. 14, 18–19 (S.D.N.Y.1981) (tracing legislative history of section 605 back to Radio Act of 1927 wherein protection against unauthorized use was extended beyond radio transmission personnel).

 Section 605's proscriptions are set forth in four sentences, with a one-sentence proviso clarifying that these proscriptions do not apply to radio broadcasts "for the use of the general public" or amateur, distress or citizens band broadcasts.[2] As this circuit has held, liability under section 605 requires proof that a defendant has "(1) intercepted or aided the interception of, and (2) divulged or published, or aided the divulging or publishing of, a communication transmitted by the plaintiff." *National Subscription Television v. S & H TV*, 644 F.2d 820, 826 (9th Cir.1981). The primary thrust of the defendant's statutory argument is that his actions in pirating the plaintiff's microwave signal do not constitute the proscribed divulgement or publication of intercepted radio signals.[3] We disagree.

In *National Subscription Television*, we held that the "act of viewing" unauthorized subscription television programming with the aid of an unauthorized television signal decoder constituted "divulgement or publication." 644 F.2d at 827. We found that the unauthorized viewing of intercepted television programming "amounts to disclosure of the 'existence, contents, substance, purport, effect or meaning' of" the transmitter's signal. *Id.* Accordingly, the act of viewing a misappropriated radio signal

---

1. *See* Comprehensive Cable Telecommunications Act of 1984, Public Law No. 98–549, § 5(a), 98 Stat. 2802, 2804.

2. As the defendant concedes, this proviso does not apply to the plaintiff's communication because its broadcasts are not intended for general public use and the plaintiff does not qualify as a broadcaster. *Movie Systems v. Heller*, 710 F.2d 492, 494–45 (8th Cir.1983). The intent of the sending party determines if the sender is a broadcaster within the meaning of the proviso. *See National Subscription Television v. S & H*

*TV*, 644 F.2d 820, 824–25 (9th Cir.1981). The district court in this case found that the plaintiff's intent was to limit access to their signal.

3. As it is unnecessary to the disposition of this case, we express no opinion on the defendant's construction of section 605 in which he contends that only the second and fourth sentences (formerly the second and fourth clauses) apply to him because he is not a radio communications employee.

falls within the statutory proscription against divulgement or publication.

■ Although the defendant has attempted to distinguish *National Subscription Television* as a case involving non-MDS technology in which a scrambling device was used to protect the transmitted signals, we find no substance to the distinction. The presence or absence of scrambling devices was correctly dismissed as irrelevant by the district court on both factual grounds—the technology was not available until after the defendant's misappropriation—and legal grounds. *See Movie Systems v. Heller*, 710 F.2d at 495 n. 7 (affirming injunction against MDS interception and holding that section 605 does not require scrambling as a precondition for protection); *Hoosier Home Theater, Inc. v. Adkins*, 595 F.Supp. 389, 396 (D.Ind.1984) (issuance of injunction against MDS intercept; scrambling unnecessary to acquire section 605 protections); *American Television & Communications Corp. v. Western Techtronics, Inc.*, 529 F.Supp. 617, 621 (D.Colo.1982) (scrambling an expensive and futile act because of the availability of decoding devices); *HBO v. Advanced Consumer Technology*, 549 F.Supp. at 21. Stated simply, the defendant has not presented any case law which suggests that MDS communications should be treated any differently under section 605 from traditional subscription services over normal television frequencies.

■ Finally, the FCC, which licenses MDS common carriers, has also spoken on the subject of section 605's applicability to the unauthorized interception of MDS signals. According to the FCC, "persons will be in violation of [section 605] if they divulge, publish, or use for their own benefit any MDS communications which they were not authorized to receive." F.C.C. Public Notice No. 11580 (January 24, 1979). Deference is due to the expressed opinions of the FCC on matters within their jurisdiction. *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965).

Perhaps in appreciation of his precarious legal position on the merits, the defendant has attempted to introduce *Sony Corporation v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), under an attenuated "reasoning by analogy" theory, to reinforce his position. He claims that the "spirit" of the *Sony* opinion requires this court to refrain from interpreting an old statute so as to intrude into the defendant's living room. Because his equipment is allegedly capable of other noninfringing uses, according to the defendant, *Sony* requires that he be permitted to use it. The short answer is that *Sony* dealt with the interpretation of copyright law, not the Federal Communications Act. Moreover, the Court's *Sony* opinion, like the district court's decision in the same case, expressly noted that the *Sony* case did not involve subscription broadcasting. *Sony*, 104 S.Ct. at 780. Finally, the district court in this case entered a finding that the defendant did not engage in any noninfringing uses with his equipment.

## II.

The final argument raised by the defendant on appeal is a First Amendment challenge to the district court's injunction. Citing *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969), the defendant contends that he has a First Amendment right of access to public radio signals which is infringed by the district court's injunction against the use of his equipment. In support of this contention, he urges this court to acknowledge that his equipment can also receive some nonsubscription educational programming. He argues that he has a First Amendment right to listen to this noninfringing communication. The plaintiff has countered with references to the record allegedly indicating that the defendant's equipment could not receive this educational programming (known as "ITFS" programming). The district court rejected the defendant's First Amendment claim and enjoined the defendant from further

use of his rooftop equipment in violation of section 605.

■ Although the defendant's First Amendment argument may have some validity in the abstract, on the facts of this case we find it unpersuasive. Reception of the MDS signal depends on a direct line-of-sight placement of the equipment. Defendant's equipment was at all pertinent times directed to the plaintiff's transmitter. The district court specifically found that the sole and exclusive use to which the defendant has put his equipment is the unlawful pirating of plaintiff's signal. Defendant enjoys no right of access to this use.

We need not speculate on possible other uses for the defendant's equipment because the terms of the district court's affirmative injunction are carefully drawn so as to avoid any direct confrontation with any First Amendment right the defendant may enjoy as a result of possible multiple uses for his roof equipment. Specifically, the third paragraph of the injunction prohibits the defendant from:

> Failing to keep removed from all buildings under his ownership, custody or control, any and all microwave antennae, down converters, and power supplies *designed to intercept or receive plaintiff's microwave transmissions.*

E.R. 26. Thus, the injunction appears to be limited in scope to a prohibition on infringing uses. Given the dearth of evidence on alternative noninfringing MDS broadcasts, the unequivocal finding by the court that the defendant's exclusive use of the equipment was in violation of section 605, and the limited scope of the injunction, the district court's judgment does not infringe on any First Amendment interests of the defendant.

## CONCLUSION

The judgment of the district court is AFFIRMED.

---

* William Brock has been substituted for Raymond J. Donovan pursuant to Fed.R.App.P.