**PREMIER COMMUNICATIONS NET-WORK, INC., a California corporation, Plaintiff–Appellee,**

v.

**Edward FUENTES, Elvera Fuentes, individually and on behalf of all other persons similarly situated, Defendants–Counter Complainants–Appellants,**

v.

**PREMIER COMMUNICATIONS NET-WORK, INC., Raymond Conley, H. Wayne Goodroe, Farrow, Schildhause, et al., Counter Defendants–Appellees.**

**PREMIER COMMUNICATIONS NET-WORK, INC., a California corporation, Plaintiff–Counter–Claimant Defendant–Appellant,**

v.

**Edward FUENTES; Elvera Fuentes, individually and on behalf of all other persons similarly situated, Defendants–Counter–Claimants–Appellees.**

Nos. 85–2869, 86–1534.

United States Court of Appeals, Ninth Circuit.

Argued Jan. 14, 1987.

Resubmitted March 30, 1987.

Decided July 26, 1989.

Rita F. Gilmore and Barbara Clementino, Sedgwick, Detert, Moran & Arnold, David W. Evans, Long & Levit, San Francisco, Cal. and H. Wayne Goodroe, Farrow, Schildhause & Wilson, Oakland, Cal., for plaintiff-counter-claimant-defendant/appellee/appellant.

Rodney Shepherd and Richard E. Brown, Law Offices of Melvin M. Belli, Sr., San Francisco, Cal., for defendants/counter-claimants/appellants/appellees.

Before HUG, SCHROEDER and ALARCON, Circuit Judges.

HUG, Circuit Judge:

This case concerns actions taken by plaintiff, Premier Communications Network, Inc. ("Premier"), to prevent unauthorized viewing of the television entertainment program that it provides to subscribers by microwave transmission. The issues on appeal are (1) whether Premier is entitled to an injunction; (2) what the injunction may provide; (3) whether Fuenteses' counterclaim for damages resulting from the Premier's letter threatening legal action was properly dismissed because the letter was a privileged communication; and (4) whether Premier's due process rights were violated when the district court ordered it to send a curative letter offering refunds.

I.

Premier is engaged in the business of marketing and distributing a private, commercial-free, pay television entertainment service to subscribers in the San Francisco Bay Area. The programming which Premier provides to its subscribers originates from the New York Studios of Home Box Office, Inc. ("HBO"). The programming is sent from New York by means of microwave radio frequencies as part of a system known as a multipoint distribution service ("MDS"). The microwave transmissions are relayed to mountain-top receiving stations. The transmissions are then relayed to, and received by, microwave antennae located at the customers' homes. Successful reception of the transmissions requires that the microwave antennae be pointed at the mountain-top stations, with a clear line-of-sight transmission path. A "down-converter," also located at the customer's home, is then needed to modulate the microwave frequency into a VHF frequency, which can then be displayed in intelligible form on a standard television set. Premi-

er, as the exclusive San Francisco Bay Area licensee for HBO's programming, provides the necessary microwave antennae and down-converters for its customers. Premier's sole source of revenue comes from the monthly fee that customers pay for the equipment rental and HBO transmission.

Defendants–Appellants, Edward and Elvera Fuentes, are individuals living in San Jose. They are not customers of Premier. However, they own microwave equipment that is capable of receiving Premier's HBO programming. They can view the programming because the microwave signals are not "scrambled" by HBO. The Fuenteses have admitted to watching HBO without paying. The microwave equipment also enables the Fuenteses legitimately to receive instructional television programming, such as that offered by the Roman Catholic Communications Corporation ("RCCC").

Because people, such as the Fuenteses, can watch HBO programming by simply buying their own microwave antennae, Premier has been losing potential revenue. In order to combat this unauthorized reception, Premier hired Raymond Conley and Associates ("Conley") to use electronic and photographic surveillance equipment to snoop around people's homes and find out who both (1) owned microwave antennae

and (2) did not subscribe to HBO. A list of over 17,000 such names and addresses was then compiled for the Bay Area.

Premier then hired the Oakland law firm of Farrow, Schildhause, Wilson & Rains ("FSW & R"),[1] which sent out form letters on July 31, 1984 to the 17,000 individuals on the list. The letters stated that a survey had shown that the recipients were engaged in unauthorized viewing of HBO in violation of California and Federal law, and that a civil suit seeking an injunction and damages would soon be filed. The letters demanded, *inter alia*, that the recipients (1) pay $300 as settlement; (2) take down their microwave antenna; and (3) stop unauthorized watching of HBO.[2]

The Fuenteses then brought suit in state court on August 8, 1984, against Premier, Conley, and others, alleging tortious conduct. Premier instituted the present separate action on August 17, 1984, in Federal District Court against the Fuenteses. Premier asked for defendant class certification of the 9,000 people who did not respond to the settlement letter. The district court has not ruled on the certification of this class. Premier prayed for permanent injunctive relief, a declaration that the Fuenteses had violated 47 U.S.C. § 605 (Supp. III 1985), and damages. The Fuenteses filed an answer and counterclaim against Premier, Conley, FSW & R,

---

1. Now known as Farrow, Schildhause & Wilson.

2. The letter to the Fuenteses, dated July 31, 1984, stated, in pertinent part:

I represent Premier Communications Network, Inc., dba Premier Channel, the sole licensee for microwave transmission of Home Box Office (HBO) programming in the San Francisco Bay area.
An electronic and photographic survey of your neighborhood indicates that for some time you have been receiving HBO programming without authorization. This is a violation of both California and Federal law and can result in civil damages in excess of $1,000 for even attempting to intercept this private communication.
On AUGUST 20, 1984 a civil suit will be filed in United States Federal District Court for the Northern District of California seeking an injunction to prevent your further unauthorized reception of HBO as well as the maximum damages allowed by law. Premier Channel has instructed me to include you in this litigation unless ALL OF THE FOLLOWING THREE STEPS TAKE PLACE ON OR BEFORE AUGUST 15, 1984:
    1. IMMEDIATELY remove the unauthorized equipment.
    2. Sign the enclosed agreement to stop your illegal reception of the HBO signal.
    3. Return this agreement with your check or money order for $300 made payable to Premier Channel no later than AUGUST 15, 1984. A return envelope is enclosed for this purpose. This amount is considered to be an out of court settlement of all prior and present claims against you. This settlement offer is not negotiable.
Should you fail to settle this claim by AUGUST 15, 1984, this offer will be withdrawn and you will be included in the forthcoming litigation.
    THIS IS YOUR ONLY OPPORTUNITY TO SETTLE THIS CLAIM FOR THIS AMOUNT. Please contact us without further delay.

and others, alleging that they had violated, *inter alia*, 18 U.S.C. § 1962(c) (1982) ("RICO"), perpetrated fraud, caused emotional distress, and invaded their privacy. The Fuenteses also sought class certification. The Fuenteses' counterclaim was dismissed. Later, Premier moved for summary judgment on the issue of permanent injunctive relief, and this was granted. These matters form the basis of the Fuenteses' Appeal No. 85–2869.

After the injunction was granted, Premier sent out another form letter to the remaining 9,000 suspected pirates, which repeated the demands of the first letter.[3] However, the second letter informed its recipients that they were defendants in the *Fuentes* lawsuit, even though no defendant class had ever been certified, and even though only the Fuenteses were affected by the summary judgment order. The court was overwhelmed with public inquiries, and after an emergency status conference, Judge Aguilar ordered that a curative letter be sent, allowing payers of the settlement claims to get their money back, if they so desired. Premier and the others contend that this order, requiring possible return of money it had acquired, violated their due process rights. This is the subject of the Premier's Appeal No. 86–1534.

We have appellate jurisdiction under 28 U.S.C. § 1292(a)(1) (1982) to consider the portion of the appeal dealing with the permanent injunction. Premier's motion for class certification remains under submission, and Premier's claim for damages against the Fuenteses has not been determined; thus, there is no final judgment as to all claims involved in this action. However, we have appellate jurisdiction to consider the other issues raised in this appeal because of the certification of the district court under Fed.R.Civ.P. 54(b).

## II.

█ Premier alleged that the Fuenteses, in their unauthorized reception of HBO, violated section 705 of the Communications Act of 1934 (current version at 47 U.S.C. § 605 (Supp. III 1985)). The Fuenteses admit to unauthorized reception, but they claim that 47 U.S.C. § 605 does not apply to their conduct. The district court granted summary judgment in favor of Premier.

We review a grant of summary judgment *de novo*. *Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir.1986). The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Ashton v. Cory*, 780 F.2d 816, 818 (9th Cir.1986).

The Ninth Circuit has already decided, in a case similar to the one before us now, that the unauthorized reception of un-

---

**3.** The letter, dated November 12, 1985, stated in pertinent part:

Federal Judge Robert Aguilar has issued his decision in the Home Box Office microwave piracy case. This Federal Court Order firmly establishes that it is illegal to receive our HBO microwave programming. A copy of the Judgment is enclosed for your review.

Your name still appears in the Federal Court lawsuit now on file in San Jose. Civil damages for violators of this law can be as high as $10,000. In order for you to avoid inclusion in the damages phase of this continuing litigation we are extending our offer to you to settle out of court. We are giving you this opportunity as you may have been misled by others in the past. Please understand that those who fail to accept this offer will be pursued to the fullest extent allowed by the law.

Below are listed the three conditions that must be fully met for this out of court settlement:

1. IMMEDIATELY remove the unauthorized equipment;

2. Sign the enclosed agreement to stop your illegal reception of the HBO signal;

3. Return the agreement with your check or money order in the settlement amount of $300 made payable to Premier Channel not later than November 25, 1985. A return envelope is enclosed for this purpose. This amount is considered to be an out of court settlement of all prior and present claims against you.

THIS IS YOUR FINAL OPPORTUNITY TO SETTLE THIS CLAIM OUT OF COURT. Should you fail to settle this claim by November 25, 1985, this offer will be withdrawn and you will continue to be included in the Federal Court litigation and subject to damages as determined by the courts.

scrambled MDS transmissions of subscription home television entertainment is a violation of 47 U.S.C. § 605. *California Satellite Systems v. Seimon ("Benvenuti")*, 767 F.2d 1364, 1366–67 (9th Cir.1985). The Fuenteses' arguments as to why section 605 does not apply to their conduct are the same as those raised and deemed insufficient in *Benvenuti*. Thus, viewing the evidence in the light most favorable to the Fuenteses, the district court, after applying the relevant substantive law, as expressed in *Benvenuti*, correctly granted summary judgment as to the violation of 47 U.S.C. § 605.

### III.

■ On October 28, 1985, the district court based on a summary judgment granted a permanent injunction that prohibited the Fuenteses from receiving Premier's microwave signals without authorization. The injunction also required the Fuenteses to remove their microwave antenna and related equipment.[4] Fuenteses contend that this injunction is ambiguous and infringes on their first amendment rights.

We review the district court's grant of permanent injunctive relief for an abuse of discretion or application of erroneous legal principles. *SEC v. Goldfield Deep Mines Co.*, 758 F.2d 459, 465 (9th Cir.1985). However, challenges to an injunction on specificity grounds pursuant to Fed.R.Civ.P. 65(d) are reviewed *de novo*. *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985). Fed.R.Civ.P. 65(d) "requires the language of injunctions to be reasonably clear so that ordinary persons will know precisely what action is proscribed." *Id.* Fur-

thermore, "injunctive relief should be no more burdensome to the defendants than [that] necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979).

Paragraph 3 of the injunction contains language which enjoins Fuenteses from "[f]ailing to keep removed from all buildings under their ownership, custody or control, any and all microwave antennae, down-converters, and power supplied *designed to intercept or receive* plaintiff's microwave transmissions." (emphasis added). It is not clear what the words "designed to intercept or receive" mean in this case. They could mean that the equipment must be removed if it was designed or installed in such a way that its sole use was an infringing one. Or, they could mean that Fuenteses must remove any equipment that has the capability of receiving Premier's signals, even though the equipment is capable of legitimate uses and was being used for legitimate purposes. Because of this ambiguity, it is not clear what the Fuenteses must do to comply with the injunction.

This is the exact language used in the injunction which we upheld in the *Benvenuti* case. However, our affirmance of this injunctive language was qualified as being appropriate only under the specific facts of that case. We stated:

> Although the defendant's First Amendment argument may have some validity in the abstract, on the facts of this case we find it unpersuasive. Reception of the MDS signal depends on a direct line-of-sight placement of the equipment. Defendant's equipment was at all perti-

---

**4.** The injunction stated, in pertinent part:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that a permanent injunction is granted in favor of plaintiff and against defendants Edward Fuentes and Elvera Fuentes. Defendants Edward Fuentes and Elvera Fuentes and their officers, agents, servants, employees, attorneys, privies, and all persons in active concert and participation with them are enjoined permanently from:

1. Intercepting and divulging or publishing, or receiving and using plaintiff's microwave transmissions without authorization by plaintiff;

2. Assisting, aiding, abetting, or conspiring with any person to intercept and divulge or publish, or receive and use plaintiff's microwave transmissions without authorization by plaintiff;

3. Failing to keep removed from all buildings under their ownership, custody or control, any and all microwave antennae, down converters, and power supplies designed to intercept or receive plaintiff's microwave transmissions.

nent times directed to the plaintiff's transmitter. The district court specifically found that the sole and exclusive use to which the defendant has put his equipment is the unlawful pirating of plaintiff's signal. Defendant enjoys no right of access to this use.

. . . .

Thus, the injunction appears to be limited in scope to a prohibition on infringing uses. Given the dearth of evidence on alternative noninfringing MDS broadcasts, the unequivocal finding by the court that the defendant's exclusive use of the equipment was in violation of section 605, and the limited scope of the injunction, the district court's judgment does not infringe on any First Amendment interests of the defendant.

*Benvenuti,* 767 F.2d at 1368.

Microwave antennae and down-converters are not illegal to own, and they can be used for legitimate purposes. In Mr. Benvenuti's case, it was uncontested that his sole use of the antenna was an illegal use, and thus an injunction compelling removal of the antenna was fully justified.

In this case, however, there is evidence that the Fuenteses did use the equipment for the legitimate purpose of viewing the RCCC programming and to enhance their UHF television reception. They admitted using the equipment for the unlawful purpose of intercepting Premier's signal. It is clear that the Fuenteses can be enjoined from intercepting Premier's signal; the more difficult question is whether they can be required to remove equipment whose design is such that in addition to being used to intercept Premier's signal, it can also be used, and was used, for other lawful purposes.

Premier is not entitled to an injunction preventing members of the general public from using modern technology that has multiple substantial uses just because one of those uses would be the unlawful reception of its signal. On the other hand, Premier is entitled to an injunction preventing the use of the equipment unlawfully to receive its signal. We conclude that paragraph 3 is ambiguous and overbroad in accomplishing this purpose.

The factual determination underlying the granting of the injunction in this case was not based upon a trial, but rather upon a summary judgment. Thus, although the district court enumerated "findings of fact," in actuality, any such factual determinations could only be based upon undisputed facts or facts about which there was no genuine issue. With regard to the first two paragraphs of the injunction, which enjoined the Fuenteses from the unauthorized receipt of Premier's signal, there is a sound factual basis, because they admitted having done so. However, with regard to the third paragraph, requiring removal of the antenna and related equipment, our review is hampered because of the lack of actual factual findings by the district court.

There is evidence that the Fuenteses used the antenna and related equipment in viewing the RCCC programming and to enhance their UHF television reception. There is no finding as to whether these were legitimate substantial uses. There is evidence that reception of the MDS signal requires accurate positioning of the microwave antenna on the roof in direct line of sight with the common carrier's transmitter. It is unclear whether merely enjoining the Fuenteses from pointing or otherwise positioning the antenna in a direct line of sight with the MDS transmitter would prevent unauthorized use and would be detectable by viewing the antenna from the street. If so, a less burdensome injunction could be formulated that would provide effective relief to Premier without infringing on legitimate activity.

Therefore, we affirm the injunction as entered, with the exception of paragraph 3, and we remand for reconsideration of that paragraph. Before any injunctive provision requiring removal of the antenna and related equipment can be entered, appropriate factual findings must justify such action.

## IV.

■ The Fuenteses' counterclaim against Premier involved Premier's first

demand letter. Counts 1 and 2 alleged violations of RICO. Counts 3 through 7 alleged intentional infliction of emotional distress, outrageous conduct, misrepresentation, invasion of privacy, and negligence, respectively. Count 8 was a prayer for declaratory relief. Premier and its lawyers, however, claim that their conduct, in sending demand letters offering settlements in anticipation of litigation, is privileged under California law and cannot form the basis for liability. The district court held for Premier and its lawyers. We review a district court's interpretation of state law under the same independent *de novo* standard as we do questions of federal law. *Matter of McLinn*, 739 F.2d 1395, 1397 (9th Cir.1984) (en banc).

California Civil Code Section 47 states, in pertinent part: "A privileged publication or broadcast is one made ... 2. In any ... judicial proceeding...." Cal.Civil Code § 47 (West 1982). The Ninth Circuit has already reviewed the decisions of the California intermediate appellate courts regarding this statute, in *Hagendorf v. Brown*, 699 F.2d 478 (9th Cir.1983), *modified in part*, 707 F.2d 1018 (9th Cir.1983). *Hagendorf* found that absolute immunity attaches to a publication if it "(1) was made in a judicial proceeding; (2) had some connection or logical relation to the action; (3) was made to achieve the objects of the litigation; and (4) involved litigants or other participants authorized by law." *Hagendorf*, 699 F.2d at 480 (citing *Bradley v. Hartford Accident & Indem. Co.*, 30 Cal. App.3d 818, 825, 106 Cal.Rptr. 718 (1973)). The *Hagendorf* court also found:

> California courts have ruled explicitly that the privilege extends to preliminary communications such as demand letters from attorneys. [Citing *Larmour v. Campanale*, 96 Cal.App.3d 566, 568–69, 158 Cal.Rptr. 143 (1979); *Lerette v. Dean Witter Org., Inc.*, 60 Cal.App.3d 573, 577–78, 131 Cal.Rptr. 592 (1976).] Filing suit before the publication is not required. *Lerette*, 60 Cal.App.3d at 577, 131 Cal.Rptr. 592.

*Hagendorf*, 699 F.2d at 480.

Thus, the above *Hagendorf* quotation makes it clear that the Federal District Court's Order of October 28, 1985, finding Premier and its attorney absolutely privileged in publishing their first demand letter, was an accurate determination of California law at the time it was filed.

However, since the filing of that order, a new opinion has issued from a California Appellate Court concerning the scope of the judicial proceeding privilege of Cal.Civil Code § 47. This case, *Fuhrman v. California Satellite Sys.*, 179 Cal.App.3d 408, 231 Cal.Rptr. 113 (1986), is factually very similar to the one before us now. In *Fuhrman*, a sender of microwave television signals also sent form letters to thousands of alleged microwave pirates, threatening legal action and demanding payment. Fuhrman received one of the letters, and brought suit for, *inter alia*, extortion, fraud, and intentional infliction of emotional distress. The defendant demurred. The trial court found as a fact that the demand letters were absolutely privileged under section 47, and on that ground sustained the demurrers without leave to amend. *Id.*, 231 Cal.Rptr. at 114–16. Although the appellate court held that some of the demurrers were properly sustained on other grounds, it nonetheless found that the trial court had erred in factually finding at the demurrer stage that the letters were absolutely privileged. The appellate court stated:

> [There is] a serious question whether the letters in this case were published in good faith and serious contemplation of litigation. The first letter is a form letter sent to approximately 8,700 residents of the county. This alone raises doubt as to the seriousness of Cal–Sat's threat to file suit. The letter provides no factual support for the allegations made against individual residents. It leaves no room for negotiation or explanation, but states it represents the "only opportunity to settle this claim for this amount."

*Fuhrman*, 231 Cal.Rptr. at 119. The court then held:

> If defendants assert the privilege as an affirmative defense, they may defeat plaintiff's action by showing they published the letters in good faith and seri-

ous contemplation of litigation against her. But this is an issue of fact not properly resolved on a demurrer.

*Id.* (citation omitted).

A subsequent decision of a California Court of Appeal has cited the *Fuhrman* case with approval, stating:

California has adopted the view of the Second Restatement of Torts that the speaker's or writer's actual good faith contemplation of litigation is required to establish the privilege for prelitigation statements. (*Fuhrman, supra* [179 Cal. App.3d at] 422 n. 5, 231 Cal.Rptr. 113)

*Financial Corp. of Am. v. Wilburn,* 189 Cal.App.3d 764, 234 Cal.Rptr. 653, 660 (1987). *See also Carden v. Getzoff,* 190 Cal.App.3d 907, 235 Cal.Rptr. 698, 701–02 (1987) (citing with approval but distinguishing where legal action was contemplated in good faith).

In the case at bar, the same issues of fact arise as in *Fuhrman.* A virtually identical form letter (*compare Fuhrman,* Appendix A, 231 Cal.Rptr. at 126, *with* footnote 2, *supra* ) was sent to thousands of people in both *Fuhrman* and the case at bar. As in *Fuhrman,* the number of letters sent by Premier "alone raises doubt as to the seriousness" of Premier's original intent to litigate. *Id.* at 119.

Because of the similarity and importance of *Fuhrman,* we find the case has retroactive effect. "We owe deference ... to state court decisions which alter existing law, including decisions of intermediate state courts, and we will follow appropriate precedent even if it is announced after the district court has ruled." *Plyler v. Wheaton Van Lines,* 640 F.2d 1091, 1093 (9th Cir.1981) (citing *Vandenbark v. Owens–Illinois Glass Co.,* 311 U.S. 538, 543 & n. 21, 61 S.Ct. 347, 350, & n. 21, 85 L.Ed. 327 (1941)). We therefore vacate the district court's order of October 28, 1985, and remand for reconsideration of the counterclaims in light of *Fuhrman.*

## V.

■ After the district court issued the permanent injunction, Premier sent out its second demand letter. *See supra,* footnote 3. The district court found this letter to be "reprehensible," in light of the fact that it conveyed the impression that the recipients were actually defendants in the lawsuit. The court then required Premier to send a curative letter and refund money to those who desired refunds. Premier claims on appeal that this violated its liberty and property interests without due process.

However, assuming, *arguendo,* that Premier was deprived of some constitutionally protected property or liberty interest, Premier received all the due process required under the standard of *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed. 2d 18 (1976). " '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' " *Id.* at 334, 96 S.Ct. at 902 (citation omitted). More specifically:

[T]he specific dictates of due process generally require[s] consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Id.* at 335, 96 S.Ct. at 903. (citation omitted)

The action taken by the district court certainly meets this standard. First, the private interest affected, if protected at all, is minimal.

Second, there seems little risk that Premier was erroneously deprived of its interest when (1) a hearing was provided for Premier to explain the letter; (2) there was never any disputed evidentiary question as to the contents, or the authors, of the letter; (3) both sides were given the opportunity to submit papers on the issue; and (4) Premier had an opportunity to move for reconsideration and modification of the court's order, which was, in fact, then

amended. Furthermore, Premier suggests no additional procedural safeguards that could have been used.

Finally, given the deluge of calls and visits to the court because of the letter, the court's interest in the matter—efficient judicial administration—was high.

Therefore, the order of the district court, as modified on December 2, 1985, is affirmed.

### VI.

The grant of summary judgment concerning the violation of 47 U.S.C. § 605 is affirmed. The grant of a permanent injunction is affirmed with the exception of paragraph three which is remanded for reconsideration. The dismissal of the Fuenteses' counterclaims is reversed and remanded. The district court's modified order of December 2, 1985 is affirmed.

REVERSED in part, REMANDED in part, and AFFIRMED in part. Each party shall bear its own costs.