**SHENANGO CABLE TV, INC. and Variety Cable TV, Inc., Plaintiffs,**

v.

**TANDY CORPORATION, of which Radio Shack is a division, a corporation, Defendant.**

**Civ. A. No. 83–2576.**

United States District Court,
W.D. Pennsylvania,
Civil Division.

Feb. 10, 1986.

Barry M. Simpson, John Daley, Brennan, Robins & Daley, Pittsburgh, Pa., for plaintiffs.

Herman C. Kimpel, George McGrann, Dickie, McCamey & Chilcote, Pittsburgh, Pa., for defendant.

## MEMORANDUM AND ORDER

SIMMONS, District Judge.

Plaintiffs, Shenango Cable TV, Inc. and Variety Cable TV, Inc. (hereinafter "Shenango"), two affiliated cable television companies, allege that Defendant, Tandy

Corporation, through its Radio Shack Division (hereinafter "Tandy"), is manufacturing, distributing and retailing a cable television converter known as the "Archer Converter" in violation of § 705 (formally § 605) of the Communications Act of 1934, 47 U.S.C. § 605 and § 633 of the Cable Communications Policy Act of 1984, 47 U.S.C. § 553. Shenango and Tandy now move for summary judgment under Fed.R. Civ.P. 56. Both parties have submitted extensive evidentiary materials, including depositions and affidavits of parties and witnesses, which present all facts that could be provable at trial.

## I. FACTS

The undisputed operative facts of record may be summarized as follows: Shenango provides cable television service[1] to customers in Mercer County, Pennsylvania and Trumbull County, Ohio area. Under Shenango's system, customers can subscribe to basic cable service[2] in order to receive cable channels in the mid and super-band[3] range. Both the mid-band cable channels and the super-band cable channels are transmitted by Shenango (in unscrambled form) through a cable wire running into the customer's home. When a customer (subscriber) elects to receive the mid and super-band services, Shenango leases as part of its monthly fee, a converter box which restricts access to only those channels subscribed to.[4]

The converter provided by cable companies, such as Shenango, converts each cable channel to VHF channel 3 or 4. Since the converter only delivers one channel at a time, the remote channel control feature of a standard TV set is eliminated because the TV must always be tuned to this channel (VHF Channel 3 or 4). In addition, standard televisions equipped with converters such as Shenango's cannot record one channel with VCR equipment while the user is watching another channel.

Tandy, through its Radio Shack division, markets and sells a product known as the "Archer Converter." The Archer Converter converts a "block" of VHF channels into UHF channels[5] thereby restoring remote control capabilities and allowing the user to record one program on VCR equipment while watching another. The Archer Converter does, however, permit owners of standard television sets,[6] who are basic service subscribers to Shenango's cable, to receive "unscrambled" and "non-trapped"[7] mid and super-band signals without paying a subscription fee for those signals/channels.

## II. DISCUSSION

Under Fed.R.Civ.P. 56(c), this Court will grant summary judgment where "the

---

1. *"Cable TV"* is the modern designation for a communications system which delivers by wire a number of channels to customers or subscribers paying a fee for such service. Ferris, Lloyd & Casey, *Cable Television Law* 5 (1985).

2. *"Basic Cable"* is the main service of cable television. It normally consists of improved reception and increased availability of broadcasting signals, non-pay satellite signals and information channels. *Cable Television Law,* at 5.

3. The mid-band range consists of 6–8 cable channels located between channels 6 and 7 on the user's television set; super-band consists of 12 cable channels located after channel 13 on the user's television. Regular broadcast channels—2 through 13 on any standard television set—can be received by the viewer on his television without the assistance of cable.

4. Shenango charges its customers a fee of $8.95/mon. for receipt of cable channels in the mid-band range and $2.75/mon. for receipt of channels in the super-band range.

5. Ultra High Frequency (UHF) channels are those stations assigned to channels 14–70.

6. It is undisputed that "Cable-Ready" or "Cable-Compatible" televisions permit the user to receive *all* of Shenango's channels—mid or super-band—without the aid of Shenango's or any other converter. Approximately 58 percent of all television sets sold in 1984 were "Cable-Ready."

   Shenango further concedes that neither the design, manufacture, marketing, or use of "Cable-Ready" televisions is in violation of Federal law.

7. Trapping (isolating and blocking out signals) or scrambling (electronically altering/distorting signals) is a protective device utilized by cable companies to protect their signals.

pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." While doubts as to the existence of genuine issues of fact must be resolved against the moving party, *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), "Rule 56(e) does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Insurance Company of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir.1982). The party opposing a motion for summary judgment "must set forth the specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Viger v. Commercial Insurance Company of Newark, N.J.*, 707 F.2d 769, 771 (3d Cir.1983). ("Naked assertions in the pleadings are insufficient to withstand summary judgment.")

Defendant Tandy maintains that the Archer Converter is designed and marketed *solely* to 1) restore remote control capacity; and 2) permit the user who owns VCR equipment to record one program while watching another, and proffered substantial evidence in support of it's position. Plaintiff Shenango, however, contends that Tandy has manufactured and marketed the Archer Converter for the *specific* purpose of unauthorized interception of Shenango's mid and super-band signals in violation of Section 705 of the Communications Act of 1934, 47 U.S.C. § 605 [8] and Section 633 of the Cable Communications Policy Act of 1984, 47 U.S.C. § 553.

Section 705 of the Communications Act of 1934 provides in pertinent part:

(a) No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

(d)(4) The importation, manufacture, sale, or distribution of equipment by any person with the *intent* of its use to assist in any activity prohibited by subsection (a) of this section shall be subject to penalties and remedies under this subsection to the extent and in the same manner as a person who has engaged in such prohibited activity.

47 U.S.C. § 605 (emphasis added). Section 705 protects radio and television communications transmitted by wire from the cable head end (initiation point) to the individual home cable subscriber. *See, e.g., Allen B. DuMont Laboratories v. Carroll*, 184 F.2d 153 (3d Cir.1950), *cert. denied*, 340 U.S. 929, 71 S.Ct. 490, 95 L.Ed. 670 (1951); *Cox Cable Cleveland Area, Inc. v. King*, 582 F.Supp. 376 (N.D.Ohio 1983). "Any manufacturer, distributor, importer, or retailer of equipment *intentionally* marketed for the unauthorized interception of signals may be held liable under Section 705." Ferris, Lloyd & Casey, *Cable Television Law* 91 26.02[1][c][i] (1985) (emphasis added).

Section 633 of the Cable Communications Policy Act of 1984 provides in pertinent part:

(A)(1) No person shall intercept or receive or assist in intercepting or receiving any communication service offered over a cable system unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

(2) For the purpose of this section, the term "assist in intercepting or receiving" shall include the manufacture or distribution of equipment *intended* by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).

47 U.S.C. § 553 (emphasis added).

The Cable Communications Act of 1984 is the first statute enacted specifically to address cable television issues. Section 633 of the Cable Act is explicitly designed as a

---

**8.** Section 705 was formally § 605—redesignated in October of 1984.

cable systems operator's cause of action against cable pirates who "tap" into the cable system and against those who assist them. See *Cable Television Law,* at ¶ 26.02[2]. It prohibits interception of signals "actually being distributed over [or within] the cable system." H.R. No. 98–934, 98th Cong., 2d Sess. 83 (1984), U.S. Code Cong. & Admin.News 1984, pp. 4655, 4720. The legislative history specifically states that Section 633 was to be in addition to, and not a replacement for, other remedies for theft of cable services, including Section 705. *Id.* at 84. Manufacturers and distributors may be liable under Section 633 "where the equipment is *intentionally* created or marketed for the unauthorized interception of signals." *Cable Television Law,* at ¶ 26.02[2] (emphasis added). The mere sale of a decoder is not enough to establish liability under Section 633. H.R. No. 98–934, at 84.

The language, legislative history and case law of the Communications Act of 1934 and the Cable Communications Act of 1984 unequivocally establish that the manufacturer, retailer or distributor of the equipment in question is liable *only* if he *intends* that the equipment he produces and sells be used for the interception or pirating of cable signals and the equipment is designed solely and specifically for that purpose.

The legislative history of Section 633, as well as the unambiguous language contained therein, makes it clear that Section 633 of the Cable Act is an anti-pirating statute and a violation will be found only where the "intent" is to pirate cable signals. The legislative history provides:

> Paragraph (a)(2) defines the term "assist in intercepting or receiving" as including the manufacture or distribution of equipment which is *intended* for authorized

reception. Thus, if a manufacturer *intends* that equipment he produces, or a distributor *intends* that equipment he distributes, or a retailer *intends* that equipment he sells, be used for interception or reception of services provided over a cable system, such person would be liable for assisting such activities. *The Committee does not intend that manufacturers, distributors or retailers be subject to liability under this section if they are engaged in the production or sale of a device or equipment which is used for legal purposes merely because the same device or equipment is capable of being used for an unauthorized reception of cable service, if they do not provide the equipment with the intent or specific knowledge that it will be used for the unauthorized reception of cable service.* Thus, the Committee does not intend a person's clearly legal conduct to become illegal because of the actions of others about which such person had no knowledge or no intention to assist.

H.R.Rep. No. 98–934, 98th Cong., 2d Sess. 83–84 (1984), U.S.Code Cong. & Admin. News 1984, pp. 4720–4721.

The case law [9] is equally clear in requiring that the intention and sole purpose of the equipment be interception and pirating of cable signals. In *Home Box Office v. Advanced Consumer Technology,* 549 F.Supp. 14 (S.D.N.Y.1981), a subscription television company sought to enjoin the manufacture and sale of equipment that permitted users to receive HBO without paying the additional fees charged. The court held that a violation of § 605 (now § 705) of the Communications Act of 1934 will be found:

> "[W]here the defendant's purpose in selling the equipment involved is to enable

---

**9.** The legislative history of the Cable Act of 1984 specifically state that Congress did not intend, by adding to Section 605 and redesignating it as Section 705, to affect any previously decided case law under Section 605. Section 705 Explanation, Cong.Rec. H12237.

Moreover, both parties and this Court agree that the prohibited acts and the remedies under Sec-

tion 605 of the Communications Act of 1934 and Section 633 of the Cable Act of 1984 closely parallel each other and in fact for all practical purposes, are identical. Therefore the case decisions interpreting Section 605 are of sound precedential value.

purchasers to intercept HBO signals, where the equipment is designed *specifically* and *solely* to intercept the MDS radio frequency band, and where without the equipment viewers with conventional sets would be unable to view HBO and unlikely to do so through some illegitimate means."

549 F.Supp. at 25 (emphasis added).

Similarly, in *California Satellite Systems v. Seimon*, 767 F.2d 1364 (9th Cir. 1985), the court enjoined a scheme aimed at pirating premium programming. The court unequivocally held that a violation occurs only where the equipment "was used *solely* to receive plaintiffs pay television programming" and "put to no other use." *Id.* at 1366 (emphasis added).

In *American Television and Communications Corp. v. Western Techtronics Inc.*, 529 F.Supp. 617, 618 (D.Colo.1982), the court enjoined the manufacture and sale of a device "designed and adjusted specially" to permit persons to receive HBO programming without paying for it. The evidence in *ATC* established that defendants had provided specific instructions to its customers on how to utilize its device to receive cable signals without paying the cable companies' subscription fee. *Id.* at 619. The court's findings could not be clearer, as it stated:

> The evidence so far presented shows that the defendants have knowingly, intentionally and purposefully sold equipment to non-subscribers to assist them in *pirating* HBO programming.

529 F.Supp. at 622 (emphasis added). *See also National Subscription Television v. S & H TV*, 644 F.2d 820, 821 (9th Cir.1981) (defendants enjoined because they sold decoding devices which were designed and manufactured to enable a user to unscramble a cable company's signal); *On/TV of Chicago v. Julien*, 763 F.2d 839, 844 (7th Cir.1985) (defendant enjoined because he "willfully and knowingly assisted the unauthorized interception of protected communications"); *Hoosier Home Theater, Inc. v. Adkins*, 595 F.Supp. 389, 393 (S.D.Ind. 1984) (the court enjoined the use of device in question based on its finding that the defendant had "assembled the equipment for the *'sole purpose'* of receiving and using the TVQs signal").

Shenango, under the statutory provisions asserted, must therefore establish that the Archer Converter was manufactured for the purpose of enabling the purchaser to intercept or assist in the interception or pirating of cable transmissions and was designed, marketed and sold specifically for that purpose.

In the present action, it is undisputed that the Archer Converter is designed, manufactured, and advertised to perform two functions:

1. It permits cable television users to utilize remote channel control, a function that is lost when cable is installed on standard television sets; and

2. It permits users of cable television sets who have purchased VCR equipment to view one cable channel while recording another channel. Again, this is a function that is lost on a standard television set when cable is installed.

It is also equally clear and undisputed that the converter will *not:*

1. Permit the user to receive any cable channels unless the user has acquired and paid for the basic cable running into his home;

2. Unscramble premium cable programming, such as HBO, Showtime and The Movie Channel and permit the user to receive these pay channels without paying the additional fees charged by his cable company; and

3. Unscramble or decode protective or security devices employed by cable companies to protect their signals. Thus, if Shenango chooses to trap or scramble channels in the mid or super-band range and charge an additional fee to the user to receive those channels, the Archer Converter will not unscramble or decode the signals and permit the user to obtain

channels in those ranges without the user paying the additional fee.

It is unquestionably clear that the Archer Converter is not a pirating device designed and/or manufactured to assist a user to "tap" into Shenango's system. Furthermore, "merely because the [converter] is capable of being used for unauthorized reception of cable service" does not render the equipment in violation of Section 633 of the Cable Act. H.R. No. 98–934, at 84. This Court therefore concludes that defendant Tandy's design, manufacture and marketing of the Archer Converter is not in violation of Section 633 of the Cable Communications Policy Act of 1984.

This Court further finds that Defendant Tany's design, manufacture and marketing of the Archer Converter is not in violation of Section 705 of the Communications Act of 1934. Plaintiff Shenango has clearly failed to adduce any evidence that Tandy intended that the Archer Converter was to be used for the interception or pirating of plaintiff's signals; nor has Shenango established that the converter was designed solely and separately for that purpose.

### III. CONCLUSION

Although Plaintiff has had more than a fair opportunity for full discovery, Plaintiff has not proffered any evidence to establish that the Archer Converter is or was *intended* to intercept or assist in the interception or pirating of Plaintiff's cable transmissions and/or is designed, marketed and sold specifically for that purpose. In fact, the uncontradicted evidence is to the contrary. While plaintiff is entitled to every favorable inference. Plaintiff may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Insurance Company of Newark, N.J. v. DuFresne,* 676 F.2d at 969. Accordingly, Plaintiff's Motion for Summary Judgment is denied and Defendant's Motion for Summary Judgment will be granted.

An appropriate order will be issued.