**MANHATTAN CABLE TELEVISION, INC., Plaintiff,**

v.

**The CABLE DOCTOR, INC. and Kenneth Sanders, Defendants.**

**No. 92 Civ. 2888 (MEL).**

United States District Court, S.D. New York.

Oct. 8, 1992.

Brief Kesselman & Knapp, New York City, Charles E. Knapp, of counsel, for plaintiff.

Young and Young, New York City, Sanford F. Young, Jan B. Rothman, of counsel, for defendants.

LASKER, District Judge.

The Cable Doctor, Inc. and Kenneth Sanders (collectively "Cable Doctor") move to dismiss the complaint of Manhattan Cable Television, Inc. ("MCTV") under Rule 12(b)(6) of the Fed.R.Civ.P. The complaint alleges that Cable Doctor installed an additional outlet for an MCTV subscriber for a fee which allowed that subscriber to receive the cable signal provided by MCTV on a second television set at the subscriber's home. MCTV provides the same service pursuant to a franchise agreement with New York City. MCTV's cable services include the provision of cable programming for one television set, and, for an additional fee, the provision of cable programming for additional televisions at the subscriber's home.

MCTV alleges that Cable Doctor's unauthorized installation of an additional outlet constitutes a violation of § 605(a) of the federal Communications Act of 1934 ("Communications Act") and § 553(a)(1) of the Cable Communications Policy Act of 1984 ("Cable Policy Act"). MCTV also alleges the violation of New York State Executive Law Section 825(6). Cable Doctor contends that its activities fall outside the scope of the federal and state regulations.

The Communications Act of 1934 provided the framework for the regulation of the communications industry at the time of its enactment, which was well before the advent of cable television. By contrast, the Cable Policy Act of 1984 established a national policy to guide the development of cable television. H.R.Rep. 98–934, 98th Cong., 2d Sess. 40, *reprinted* in 1984 U.S.Code Cong. & Ad.News 4655, 4677. Section 825 of the New York State Executive Law regulates the rates which a cable television company may charge to its subscribers.

The motion is granted.

### A. Section 605(a) of the Communications Act of 1934

In pertinent part, 47 U.S.C. § 605(a) provides:

... [N]o person receiving, assisting in receiving, transmitting, or assisting in transmitting any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof except through authorized channels of transmission or reception, (1) to any person other than the addressee....

■ The issue here is whether Cable Doctor is a "person assisting in receiving ... interstate or foreign communications by wire or radio" and whether Cable Doctor has "divulg[ed] or publish[ed] ... the contents ... thereof ... to any person other than the addressee." Although the Communications Act was enacted well before cable television came into existence, judicial decisions have extended the reach of § 605(a) to this relatively new technology, but they have not extended the scope of § 605(a) to Cable Doctor's conduct.

MCTV argues that "by using MCTV equipment, which they were not authorized to use, to provide the additional outlet in the subscriber's residence, which they were not authorized to install, defendants have violated 47 U.S.C. § 605," (Pl.Mem.Opp. at 6). It contends that because § 605(a) prohibits "person(s) assisting in receiving ... communications by wire or radio ... [from] divulg[ing] or publish[ing] ... the contents ... thereof *except through authorized channels of transmission or reception,*" (emphasis in Pl.'s Mem.) the fact that Cable Doctor lacked authorization amounts to a violation of § 605(a). But the absence of authorization would only be actionable under the statute if the conduct fell within the scope of the statute.

Cable Doctor argues that its conduct does not violate § 605(a) because the additional outlet was provided to one of plaintiff's paying subscribers who was already a member of MCTV's intended audience. Therefore, defendant contends, it did nothing which could be construed as publishing the contents of any communication "to any other person than the addressee," that is, to someone other than the intended recipient.

Most of the decisions interpreting § 605(a) deal only with devices that allow the user to intercept a cable service by descrambling the encoded signal. For, example, in *Home Box Office, Inc. v. Advanced Consumer Technology, Movie Antenna, Inc.,* 549 F.Supp. 14 (S.D.N.Y.1981), the court held that § 605(a) of the Communications Act barred the manufacture and sale of a device which permitted purchasers to intercept cable programs and thus avoid the subscription fee charged by plaintiff. *See also Telerate Systems, Inc. v. Caro,* 689 F.Supp. 221 (S.D.N.Y.1988); *Porter County Cable Company v. Moyer,* 624 F.Supp. 1 (N.D.Ind.1983). These cases do not deal with the present fact pattern. The interception of information, or so-called "tapping," is clearly distinct from the installation of a second outlet for the reception of the signal at a subscriber's home.

Two cases interpreting § 605 have dealt with other types of cable equipment. Both held that the equipment in question did not fall within the scope of the Act. In *Shenango Cable TV, Inc. v. Tandy Corporation,* 631 F.Supp. 835 (W.D.Penn.1986), the court ruled that a device which restored the possibility of taping a cable program on one channel while viewing another cable program, and which also restored remote channel control for the subscriber, did not violate either § 605(a) of the Communications Act or § 553(a)(1) of the Cable Policy Act discussed below. The court emphasized that the device sold by the defendant did not allow the user to receive channels he had not paid for or unscramble a cable signal. *Shenango Cable TV, Inc.,* 631 F.Supp. at 839. As the court put it:

[t]he language, legislative history and case law of the Communications Act of 1934 and the Cable Communications [Policy] Act of 1984 unequivocally establish that [there is liability only when there is the intent] that the equipment be used for the interception or pirating of cable signals ...

*Shenango Cable TV, Inc.,* 631 F.Supp. at 838.

In sum, although § 605(a) has been interpreted to give some protection to the cable industry, it has not been held to apply to the activities of Cable Doctor which plaintiff sues to enjoin. There is no suggestion in § 605 itself or in the decisions construing it that the Act was intended to cover the installation of an additional outlet for the reception of cable programming, and MCTV has offered no authority or rationale as to why § 605(a) should now be read more broadly. Section 605(a) prohibits "divulg[ing] or publish[ing] ... the contents [of interstate radio or wire communication] ... to any other person than the addressee." The language of the section quite clearly covers the installation of devices which allow the interception and descrambling of encoded cable programming because they can be used to divulge or publish cable programming to persons other than the intended customer. In contrast, the installation of a second outlet on the premises of a party who is already a customer of a cable operator involves neither publishing nor divulging the content of cable programming. Moreover, as Cable Doctor points out, the customer is the intended addressee of the cable programming. No one else gains access to the content of the transmission through the installation of a second outlet.

The Communications Act of 1934 could not have been intended to regulate the cable television industry at the time of its enactment. The application of the Act to television therefore proceeds in waters uncharted by legislative intent. Since the enactment of the Cable Policy Act of 1984, discussed below, there has been detailed congressional guidance on the regulation of the cable industry. Disputes about the regulation of the cable industry should therefore be primarily resolved by looking to the new Act, and not to the Communications Act. Cable Doctor's activities are not covered by either the text or the decisions interpreting the Communications Act.

## B. *Section 553(a)(1) of the Cable Policy Act of 1984*

47 U.S.C. § 553(a)(1) provides in pertinent part:

No person shall intercept or receive or ·assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

█ There is no dispute that Cable Doctor acted without the authorization of MCTV, or that MCTV is a "cable operator" as defined in.§ 522(4) of the Cable Policy Act. The issue here is whether the installation of a second outlet for the reception of cable programming amounts to "assist[ing] in intercepting or receiving any communications service offered over a cable system," and in particular, whether the installation of a second outlet at a customer's home is a "communications service offered over a cable system" within the meaning of § 553(a)(1). The text of that provision gives no guidance on the question.

MCTV argues that the phrase "communications service" encompasses not only the content of the cable program itself, but also the means of reception and delivery of the program, and that therefore the installation of a second outlet is covered by § 553(a)(1). Defendant argues that the legislative history of the Act, and the decisions interpreting it, show that it is aimed only at the theft of the content of cable programming through the installation of decoding or descrambling devices, and that an "enhancement" of service at a subscriber's home, such as the installation of a second outlet, was not intended to be covered, (Def.'s Mem. at 6).

There are three related provisions of the Cable Policy Act which cumulatively shed limited light on the interpretation of § 553(a)(1). The first, discussed immediately below, is § 522, which defines the terms used in the Act. The second, discussed thereafter, is § 521, which lists the purposes of the Act. Lastly, § 543, which covers the regulation of rates by a fran-

chising authority such as New York City, is also relevant.

The Cable Policy Act, at 47 U.S.C. § 522(5)(A), defines "cable service" as

transmission to subscribers of (i) video programming, or (ii) other programming service, and ... subscriber interaction, if any, which is required for the selection of such video programming or other programming service;

The Act does not further define the phrases "programming service" or "subscriber interaction" required for the selection of programming. So the question remains whether the installation of a second cable outlet was intended to be included in the scope of the legislation.

Section § 521, the purpose clause of the Act, provides that:

The purposes of this subchapter are to—

.    .    .    .    .

(6) promote competition in cable communications and minimize unnecessary regulation that would impose an undue economic burden on cable systems.

47 U.S.C. § 521. That purpose dictates that the statute be construed so as to limit interference with free market competition.

The aim to limit the scope of the Cable Policy Act so as to promote competition and to curtail unnecessary regulation also finds expression in § 543(b)(1). Section 543 of the Act limits the regulation of rates to the "provision of basic cable service in circumstances in which a cable system is not subject to effective competition." 47 U.S.C. § 543(b)(1). This section has been construed as barring regulation of rates charged for the installation of an additional outlet because "an additional outlet is not necessary for the reception of basic service ... and thereby, under 47 U.S.C. § 543 cannot be regulated." *City of Gillette v. TCI Cablevision of Wyoming, Inc.*, 1991 WL 329587 (D.C.Wyo.1991) at 15.

i. Legislative History of § 553(a)(1).

The legislative history of 47 U.S.C. § 553(a)(1) provides a clearer indication than the text of the Act that the installation of an outlet for the reception of cable programming is not within the regulatory

concerns of § 553(a)(1). That history echoes the concern for limiting interference with the development of free competition expressed in § 521 (the purpose clause) and § 543(b)(1) (the rates regulation clause), discussed above. In addition, it suggests positively that the installation of a second outlet does not fall within the scope of the federal regulations because of this purpose. In discussing the scope of § 553(a)(2), which defines the phrase "assist in intercepting or receiving" of § 553(a)(1), the House committee report states:

... [P]aragraph (a)(2) [of § 553] is primarily aimed at preventing the manufacture and distribution of so-called "black boxes" and other unauthorized converters which permit reception of cable service without paying for the service. However, the Committee does not intend that this section be used as a bar to the development of competition for equipment used in the reception of services by subscribers of a cable system, to the extent use of customer premises cable equipment other than that supplied by the cable operator is otherwise permissible under applicable law.

H.R.Rep. 98–934, 98th Cong., 2d Sess. 84, *reprinted in* 1984 U.S.Code Cong. & Ad. News 4655, 4721.

Because the committee report explicitly states that § 553(a)(1) aims to regulate so-called "black boxes" which permit the unauthorized interception of cable programs, it can fairly be argued that its failure to mention the regulation of other services, such as Cable Doctor's, is intentional and that they are therefore not covered by the Act. When one considers the centrality of so-called "black boxes" to Congress' concerns, as well as the aim of promoting competition in the cable industry, there is little support in the legislative history for MCTV's claim.

ii. Case Law applying § 553(a)(1).

The few judicial decisions interpreting § 553(a)(1) have not expanded the scope of that section to cover Cable Doctor's conduct, *see, e.g., Storer Communications, Inc. v. Mogel*, 625 F.Supp. 1194 (S.D.Fla.

1985). The only decision dealing with cable equipment other than decoding or descrambling devices for the interception of cable programming, *Shenango Cable TV, Inc.,* 631 F.Supp. 835, held that a mechanism which restored the possibility of taping a cable program on one channel while viewing another cable program, and which also restored remote channel control for the subscriber, did not violate either 47 U.S.C. § 553 or § 605. The court wrote that "... the Cable Communications Policy Act unequivocally establishes that [there is liability only when there is the intent] that the equipment be used for the interception or pirating of cable signals...." *Shenango Cable TV, Inc.,* 631 F.Supp. at 838.

MCTV has proffered no persuasive argument or authority as to why § 553(a)(1) should be read more broadly than the cited decisions discussed have done. As stated above, the Cable Policy Act aims to promote competition and minimize unnecessary regulation of the cable industry. That aim mandates a narrow interpretation of this provision. In addition, the House committee report explicitly states that § 553 aims to regulate devices that allow the interception of cable programming by descrambling the signal and there is reason to believe that Congress did not intend to extend regulation farther.

### C. *N.Y. Executive Law § 825(6)*

Section 825(6) provides that:

Any cable television company may initiate a civil proceeding ... to collect any rates, charges, or fees duly imposed in accordance with applicable law, or to enjoin the procurement or reception of cable television services from the facilities of such cable television company without its consent, or to enjoin the sale or distribution, to anyone other than the provider of a telecommunications service for its own use in the provision of its service, of any electronic decoder or descrambler ...

■ Plaintiff argues that Cable Doctor's activities violate § 825(6) because "only MCTV may authorize the installation of an additional outlet to a subscriber ... [and] the viewing of a transmission from the unauthorized outlet, which the subscriber was not authorized to receive, amounts to the proscribed [conduct]." (Pl.'s Mem.Opp. at 7). However, the argument misses the mark because it begs the question whether Cable Doctor's activities are covered by the statute.

Cable Doctor argues that the purpose of § 825(6) is merely to provide a cause of action to collect "rates" from subscribers and hence has no application to its activities. It also contends that § 825(6) covers only the procurement or reception of cable services "from the facilities of such cable television company," and that the installation of a second outlet is not covered by this provision. (Def.'s Reply Mem. at 11).

Section 825(6) creates two civil causes of action. First, it authorizes the collection of rates from non-paying customers and the injunction of reception of cable services by non-paying users. Second, it provides a cause of action against sellers of electronic decoders or descramblers which enable the unauthorized reception of cable programming. The text of § 825(6) makes clear that an additional outlet, such as Cable Doctor installs, is not a decoder or descrambler, which it defines as

[devices], a principal function of which defeats a mechanism of electronic signal encryption, jamming or individually addressed switching imposed by such company to restrict the delivery of its service ...

Moreover, the Memorandum of the New York Assembly Rules Committee states that:

The newly clarified description of the equipment which would be restricted from sale or distribution is designed to make sure that no one will sell to the general public a device that decodes or descrambles a secured telecommunications transmission ..., but that sales will continue to be permitted for more innocent devices traditionally available to the public, such as TV receiver sets ... and standard channel converter boxes....

Mem. of Assembly Rules Ctee., N.Y.St.Legis. Annual 1983 at 231.

There is no basis for interpreting the statute to cover Cable Doctor's activities. Cable Doctor is neither a customer of MCTV nor a party receiving MCTV's cable services without paying for them, nor is Cable Doctor selling or distributing decoders or descramblers within the meaning of § 825(6). The installation of a second outlet falls into the group of "more innocent devices" which are permitted by the legislation.

Defendants' motion is granted. The complaint is dismissed.

It is so ordered.