SNIDER COMMUNICATION CORPORATION, d/b/a Snider Telecom, Plaintiff,

v.

CUE PAGING CORPORATION and Magic Broadcasting, Inc., d/b/a Magic 105, Defendants.

No. LR–C–92–561.

United States District Court, E.D. Arkansas, W.D.

Jan. 6, 1994.

---

Kevin A. Crass, Friday, Eldredge & Clark, Little Rock, AR, for plaintiff.

Lance R. Miller, Mitchell, Williams, Selig, Gates & Woodyard, Little Rock, AR, Phil W. Campbell, Hilburn, Calhoon, Harper, Pruniski & Calhoun, Ltd., North Little Rock, AR, for defendants.

## MEMORANDUM AND OPINION

STEPHEN M. REASONER, Chief Judge.

Trial in this matter came on to be heard on September 20–21, 1993. After consideration of the arguments and issues, the Court is of the opinion that judgment should be entered in favor of the defendants on plaintiff's Communications Act claim. Also, the motions for reconsideration will be granted, and the Court will allow the parties to amend their pleadings as desired.

## I. FINDINGS OF FACT

1. The Plaintiff, Snider Communications Corporation (Snider) is an Arkansas corporation with its principal place of business in Little Rock, Arkansas. Snider is engaged in the business of providing paging service to customers in the State of Arkansas.

2. Separate Defendant Cue Paging Corporation (Cue) is a Delaware corporation with its principal place of business in the State of California. Cue is a supplier of national telecommunications services using the 57 kilohertz subcarriers of FM broadcast stations.

3. Separate Defendant Magic Broadcasting, Inc. d/b/a Magic 105 (Magic 105) is an Arkansas corporation with its principal place of business in the State of Arkansas. Magic 105 is an FM broadcast station with the call letters of KMJX.

4. Cue operates a nationwide paging system that serves more than 35,000 paging customers who use more than 85,000 active paging devices throughout all of the contiguous 48 states and much of Canada. Cue's nationwide paging information is broadcast over more than 300 FM stations. Cue's nationwide customers include private businesses, such as trucking companies, and governmental agencies, such as the Defense Department, the Central Intelligence Agency, the FBI, and the White House Communications Agency.

5. The nationwide paging services offered by Cue utilize an MBS protocol at the 57 kilohertz subcarrier channel of FM radio stations. The MBS protocol includes a "country code" which signals certain identification information to the pagers.

6. Snider operates a statewide paging system by means of a subcarrier network that also utilizes an MBS protocol at the 57 kilohertz subcarrier channel of FM radio stations in various parts of Arkansas and Memphis, Tennessee. Snider has leased from each of the various FM stations the right to utilize the 57 kilohertz subcarrier channel of the FM base band to transmit the paging information.

7. Both Snider and Cue make use of the B5 country code, and there are no nationwide paging systems, other than Cue, that use a similar MBS protocol scheme. Therefore, the B5 country code is the only such code in use on a nationwide basis in the United States.

8. Diversicom, Cue's predecessor in interest, started the nationwide system based upon the MBS protocol and the 57 kilohertz subcarrier band of FM radio stations in 1985.

9. Diversicom selected the B5 country code for its nationwide paging system.

10. Diversicom was and Cue is now the exclusive dealer/distributor of Nokia pagers in the United States.

11. Nokia is the only manufacturer of pagers designed to scan and interpret the B5 country code used by Cue and Snider.

12. In March of 1987, Nokia arranged to purchase Diversicom.

13. In April of 1990, Cue purchased the assets and assumed control of the nationwide paging system previously established by Diversicom and owned by Nokia.

14. In March, 1986, Diversicom introduced the combined local/nationwide paging system to Snider. The introduction included a technical description of the system and further provided Snider with certain equipment so that Snider could test the B5 system. Snider retained the equipment for an extended period and continued to evaluate the B5 system.

15. Snider's state system did not utilize the B5 country code, except through the direct assistance and cooperation of Diversicom.

16. In February, 1987, Snider and Diversicom entered into a five (5) year Affiliation Agreement and a First Amendment to the Affiliation Agreement, formalizing Snider's status as an affiliate. After the five (5) year term, the contract stated that it was to continue in effect "at the then current terms and conditions for similar agreements, until not less than sixty (60) days advance written notice of termination ha[d] been given by either party to the other." Cue gave Snider such notice on October 2, 1992.

17. Pursuant to the Affiliation Agreement, Diversicom granted Snider the right to operate as the Diversicom Affiliated FM subcarrier paging service in Arkansas and Shelby and Tipton counties in Tennessee.

18. Throughout the duration of their contractual relationship, Cue paid Snider, by subcarrier credits, the full amount of Snider's subcarrier leases with the FM stations on the Cue network.

19. Cue's nationwide data is received by Snider via satellite and microwave transmission and is then combined by Snider with its statewide data. The combined data is transmitted via Snider's own satellite and microwave link to the various FM radio stations located throughout Arkansas and rebroadcast over the subcarrier channels of the FM stations.

20. Upon assuming control of the former Diversicom nationwide paging system in April, 1990, Cue began working with its Affiliates to restructure the company and the affiliate arrangements. A majority of the Affiliates signed a new affiliation or distribution agreement soon thereafter. Snider refused to sign a new agreement and insisted on enforcing the 1987 Affiliation Agreement.

21. In October, 1991, Cue and Snider met to discuss renewal of their contractual relationship. At this meeting Cue gave Snider a proposed contract which Snider did not sign.

22. In subsequent negotiations, Snider contended that Cue should give Snider special terms that would favor Snider over other affiliates.

23. Although Cue and Snider never reached agreement on the terms of a new contract, they did continue doing business with one another on a month-to-month basis, generally pursuant to the terms of the existing 1987 Affiliation Agreement.

24. On or about July 31, 1992, Cue entered into a contract with Magic 105 and leased Magic 105's subcarrier capacity.

25. On August 1, 1992, Snider entered into a contract with MobilComm, a competing nationwide paging network that operates with what is termed a 900 Megahertz system.

26. On August 17, 1992, Cue began intercepting the combined Cue and Snider data streams from KUAR, one of the stations with whom Snider had a subcarrier lease, and retransmitting the combined data streams over Magic 105's FM subcarrier band. The data streams were intercepted from KUAR's tower located in central Arkansas.

27. This dual broadcast of the combined data streams over Magic 105 occurred from August 17, 1992, until September 3, 1992 at approximately 1:50 p.m.

28. The pagers issued to the customers of Cue and Snider utilize a method wherein the pager scans for a frequency carrying the B5 country code. Once an appropriate signal is found, the pager will lock on and begin searching for messages intended for the paging customer to which it has been assigned. The pager will stay locked on to the frequency until the pager is either turned off or taken out of that frequency's broadcast area.

29. Cue and Snider cannot independently and separately use the B5 country code on separate subcarrier networks in the same geographic area without causing their cus-

tomers' pagers to lock on to the other's network on a frequent basis.

30. In order to operate two subcarrier networks at the 57 kilohertz subcarrier frequency in the same geographic area and avoid a loss of pages to respective customers, both networks would have to broadcast a combined data stream.

31. In August, 1992, Snider requested that Cue set up a dual broadcast system to avoid lock-on problems in the border areas around the state of Arkansas.

32. No evidence exists that the contents of any paging messages were ever received by anyone other than the subscribers to whom they were directed during the dual broadcast period of August 17, 1992, until September 3, 1992.

33. On September 3, 1992, Snider requested and obtained an ex parte temporary restraining order from this Court.

34. Following the entry of the restraining order, Cue and Magic ceased receipt and retransmission of the data streams.

35. On October 2, 1992, Cue notified Snider pursuant to the terms of the 1987 Affiliation Agreement, that Cue was terminating the relationship between the parties, effective 90 days from that date.

36. On October 6, 1992, this Court issued a preliminary injunction extending the previous temporary restraining order. On January 28, 1993, the Court issued an amended preliminary injunction after a hearing held on January 15, 1993. Plaintiff was eventually unable to post the $100,000 bond required by the Court, and the preliminary injunction was dissolved for this reason.

## II. CONCLUSIONS OF LAW

1. Snider alleges that defendants have violated Section 705(a) of the Communications Act, 47 U.S.C. § 605(a). That section provides:

(a) Practices prohibited.

Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is transmitted by any station for the use of the general public, which relates to ships, aircraft, vehicles, or persons in distress, or which is transmitted by an amateur radio station operator or by a citizens band radio operator.

2. The first two sentences and the fourth sentence of section 605(a) apply only if a person "divulge[s] or publish[es] the existence, contents, substance, purpose, effect or

meaning" of an interstate or foreign communication. The receipt and retransmission of KUAR's subcarrier signal containing Snider's statewide paging messages did not constitute a divulgence or publication of the existence, content, substance, purpose, effect, or meaning of any of the Snider statewide paging messages to anyone other than the authorized recipients.

3. The third sentence of section 605(a) applies only when a person not entitled thereto "receive[s] or assist[s] in receiving any interstate or foreign communication by radio and use[s] such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto." There was no use of the Snider statewide paging messages contained in KUAR's subcarrier transmission between August 17 and September 3 for the benefit of anyone other than the Snider paging customers to whom the messages were directed. Further, there was no "receipt" of any communication as was anticipated by the statute.

## III. MEMORANDUM

### A. INITIAL COMMENTS

In addition to the facts set forth above, the Court feels it appropriate to make some additional comments at this time. The Court feels that the indications from exhibits and testimony are that beginning as early as 1989, Snider began raising a lot of complaints with Cue and its predecessors. Subsequent events also indicate that Snider was contemplating setting up its own network and was attempting to set up a factual basis to justify that.

Initially, Snider came to this Court asserting that Cue was obligated to remain in a contractual relationship with Snider for an indefinite time into the future. However, Cue's attorney ably predicted at a hearing held on January 15, 1993, that Snider was setting up its own network and would change its position once it was set up. Snider did, indeed, change its position and stated later that the contract was null and void. Further, the Court feels that it acted upon incorrect information when it issues its ex parte temporary restraining order on September 3, 1993. Snider's witness led the Court to believe that Cue had a pattern of cutting off service to customers who sued them. However, this does not appear to have been the case at all.

The long and short of the matter is that Mr. Gordon Kaiser, Cue's chief executive officer, correctly predicted the necessity of setting up Cue's own subcarrier system in Arkansas to prevent the possibility that Snider would cease sending Cue's national signal, which possibility did indeed occur on August 12, 1993. The Court feels Snider attempted to get special terms and concessions from Cue which Cue reasonably refused to give it. Mr. Kaiser's reasoned business decisions regarding the restructuring of the affiliate agreements prevented offering Snider terms such as subcarrier credits and reduced rates based on nonpayment of airtime for purely statewide customers. Furthermore, to offer Snider the terms it demanded in the face of the "most favored nations clauses"[1] in the contracts with other affiliates would have been disastrous to Cue's operation, forcing it to offer these same terms to the other affiliates. The Court accepts Mr. Kaiser's testimony as to his belief that the business could not continue without the restructuring that occurred. In fact he testified that his predecessor, Nokia, was losing money at a rate close to one million dollars per month under the arrangements with affiliates similar to the 1987 agreement at issue in this case.

As to the interception and rebroadcast of the KUAR signal, Mr. Kaiser's belief was that if he did not rebroadcast the signal, a lock-on problem would occur causing Snider's local customers to face the possibility of not receiving their pages. The Court feels that Mr. Kaiser believed in good faith that Snider would not consider the rebroadcast a violation of law because of Snider's own requests to have its signal rebroadcast in border areas.

### B. COMMUNICATIONS ACT

As stated above, Snider brings this suit seeking damages for violations of Section 705

1. In other words, the contracts with other affiliates contained provisions wherein each affiliate was guaranteed no less favorable terms than had been offered to other affiliates.

of the Communications Act, 47 U.S.C. § 605. Snider claims that Cue and Magic 105 violated the Act by intercepting and retransmitting Snider's statewide signal being broadcast over a local FM station, KUAR. For the following reasons, the Court must disagree. There are four sentences in 47 U.S.C. § 605(a) which might apply to the situation at hand. Beginning with the first sentence, the Court will deal with them in turn.

### i. First Sentence

The first sentence of section 605(a) provides as follows:

> Except as authorized by chapter 119, title 18, United States Code, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority.

This section requires that someone have (1) received (2) an interstate communication and (3) divulged or published that communication other than through designated or authorized channels to authorized receivers. Defendants argue that the signal intercepted from KUAR could only have been received in Arkansas and that, for this reason, the communications could only be considered intrastate rather than interstate as required by the first sentence. The argument to the con-

trary is that the communications intercepted from KUAR are also broadcast over other FM stations and are often intended for Snider customers located in Tennessee. The Court finds a decision on this point unnecessary because of defendants' second argument which is discussed in the next paragraph. However, the Court would note generally that distinctions between intrastate and interstate activities have deteriorated significantly over the last half century of Supreme Court jurisprudence. *See, Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (Court held that Congress can regulate farmer's production of wheat for home consumption under the Commerce Clause reasoning that the cumulative effect of such production could be felt on the supply and demand of the interstate commodity market).

Defendants' second argument, with which the Court agrees, is that the communications intercepted from KUAR were not divulged or published to anyone other than the intended addressees. No evidence was presented that anyone other than the persons for whom the paging messages were intended was ever privy to the content of the messages. The Southern District of New York was faced with a similar situation in *Manhattan Cable Television, Inc. v. Cable Doctor, Inc.,* 802 F.Supp. 1103 (S.D.N.Y.1992), *modified on other grounds,* 824 F.Supp. 34 (S.D.N.Y. 1993).[2] In that case a cable company sued a local company named Cable Doctor. The cable company argued that Cable Doctor's actions in installing a second cable outlet in a subscriber's home violated section 605(a). The Court held that the cable signal had not been divulged to any person other than the intended addressee. In doing so, it distinguished the interception of cable programs by nonsubscribers and said that:

> [t]he language of [§ 605(a)] quite clearly covers the installation of devices which allow the interception and descrambling of

**2.** In the original opinion, the court held that Cable Doctor's actions were not prohibited by 47 U.S.C. § 605(a), 47 U.S.C. § 553(a)(1), or New York state law. The court later reconsidered its decision concerning 47 U.S.C. § 553(a)(1) because of other legislation enacted in 1992. 47 U.S.C. § 553(a)(1) provides that:

> No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

This section has no applicability to the case at bar.

encoded cable programming because they can be used to divulge or publish cable programming to persons other than the intended customer. In contrast the installation of a second outlet on the premises of a party who is already a customer of a cable operator *involves neither publishing nor divulging the content of cable programming.* Moreover, as Cable Doctor points out, the customer is the intended addressee of the cable programming. No one else gains access to the content of the transmission through the installation of a second outlet.

*Id.* at 1106. Similarly, no one here has gained access to messages who has not paid for the service. The testimony indicated that Cue installed the network at Magic 105 in order to protect their own customers from what they believed to be a real threat that Snider would stop broadcasting the national signal.[3] It was the intent of Cue to ensure that paying paging customers, both Snider's and Cue's, received their pages. For these reasons, the Court is of the opinion that the first sentence of section 605(a) does not prohibit the defendants' conduct.

### ii. Second Sentence

The second sentence of section 605(a) reads:

> No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person.

In order to prove a violation of this sentence, a plaintiff must show both an interception and a divulgence. *Smith v. Cincinnati Post & Times–Star,* 475 F.2d 740, 741 (6th Cir. 1973) and *Greek Radio Network of Am., Inc. v. Vlasopoulos,* 731 F.Supp. 1227 (E.D.Pa. 1990). The differences from the first sentence appear to be that an interstate communication is not required but that an actual interception is.

Defendants do not contest that the signal from KUAR was intercepted, but they press the same argument as before regarding whether any communications were divulged.

The Court is of the opinion that the same analysis applies. Because no one unauthorized to receive the messages ever viewed the content of those messages, no violation of the second sentence has occurred.

### iii. Third Sentence

The third sentence of § 605(a) provides:

> No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

Defendants argue that no communications have been used for their benefit or for the benefit of anyone not entitled thereto. The Court is in agreement. As stated above, defendant Cue's motivation in intercepting the signal was to avoid a loss of paging messages to their national customers who would be travelling in Arkansas, not to provide paging services to persons who had not paid for the service. Also, Cue did not use the content of any message to its own or anyone else's benefit.

Furthermore, the Court is of the belief that it is doubtful whether defendants have even "received" any communications as that term was intended in the statute. It is true that defendants did intercept the signal broadcast over KUAR. However, receiving the signal does not necessarily equate to receiving a "communication." The Court has not been directed to any cases that do not turn essentially on the fact that the content of a communication had been intercepted or used to an unauthorized person's benefit. Neither has happened in this case. For these reasons, no violation of the third sentence has occurred.

### iv. Fourth Sentence

The fourth sentence of section 605(a) reads as follows:

> No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that

---

**3.** A belief that later came true.

such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

This section also requires a publishing or divulging, and the Court is of the opinion that none has occurred for the same reasons set out above in the discussion of the first three sentences of the statute.

### v. Purpose of section 605(a)

In sum, the Court is of the opinion that section 605(a) was not intended to cover the situation at hand. In *United States v. Russo*, 250 F.Supp. 55 (E.D.Pa.1966), the court stated that:

The purpose of section 605 is to prohibit blatant public or private encroachments on the privacy of messages and the integrity of communication systems....

In order to protect this secrecy, section 605 prohibits persons who are in a position to *divulge the content of a message* from revealing even its existence. This provision contains two distinct kinds of prohibitions intended to apply to different situations. Clause 1 prohibits the unauthorized divulgence of the fact of the "existence, contents, substance, purport, effect, or meaning" of a message by anyone assisting in its transmission or reception. This restriction is designed to apply to persons such as telegram or radiogram operators, who must either learn the content of the message or handle a written record of communications in the course of their employment. Clause 1 recognizes that the integrity of the communication system demands that the public be assured that *employees who thus come to know the content of messages will in no way breach the trust which such knowledge imposes on them. Clause 3, not relevant in this case, extends similar restrictions to unautho-*

*rized persons who assist in the transmission or reception of these messages.* In order to further insure secrecy, clauses 2 and 4 establish a blanket prohibition of any disclosure by unauthorized persons who intercept a communication during its transmission.

*Id.* at 58–59 (emphasis added). The *Russo* case indicates that the first sentence of section 605(a) was aimed at persons who assist in the transmission or reception of the messages and that the third sentence was aimed at persons whose job requires them to learn the content of a communication. The Court is of the opinion that the section 605(a) as designed by Congress was intended to prohibit persons like Western Union operators and telephone operators from actually reading or listening to the communications sent through their systems and using the content of the communications to their personal benefit. Privacy was the main intent of the Act. For example, corporate officers should feel free to communicate over the telephone or wire with one another about such things as pricing strategies or potential acquisitions without fear than an operator will receive the information and sell it to competitors of the corporation.

The *Russo* case also speaks in terms of the content of the messages rather than just the messages themselves. In this Court's opinion, all four sentences were essentially designed to protect the content of communications. To hold that Cue's and Magic 105's actions violate section 605 would extend the reach of the legislation beyond the obvious intent of Congress. Although arguments can be made that the activity complained of should not be allowed, Snider has not directed the Court's attention to any legislation or other legal reason that prohibits it.[4]

Section 605 has most recently been used to prevent persons from using or selling devices to intercept or descramble programs on cable networks such as HBO and Showtime. *See, e.g., California Satellite Sys. v. Seimon*, 767

---

4. At this point the Court feels it appropriate to note that plaintiff has apparently chosen not to pursue a violation of 47 C.F.R. § 73.1207. This regulation would appear to cover the situation, and was, in fact, the basis for the Court's is-

suance of a preliminary injunction even though it was not cited by either of the parties but was discovered through the court's own research. However, the issue is not now before the Court.

F.2d 1364 (9th Cir.1985), *Entertainment and Sports Programming Network, Inc. v. Edinburg Community Hotel, Inc.,* 735 F.Supp. 1334 (S.D.Tex.1986), and *Home Box Office, Inc. v. Corinth Motel, Inc.,* 647 F.Supp. 1186 (N.D.Miss.1986). Courts have held in these cases that "the act of viewing a transmission that the viewer was not authorized to receive constitutes a divulgement or publication." *Greek Radio,* 731 F.Supp. at 1232, *see also, California Satellite Sys.* 767 F.2d at 1366. In other words, because the person is actually viewing the content of the program he is not entitled to view, he has divulged or published the contents to himself. In this Court's opinion, these cases are distinguishable. In the cable television situation, although the protection of privacy is arguably not the main concern, the courts are still concerned with the unauthorized viewing of the contents of the programs. The situation at hand is simply different. No unauthorized viewing of the content of any message has taken place, and in this Court's opinion, section 605(a) was simply not meant to encompass the defendants' conduct.

In 1984 Congress felt compelled to amend section 605 to specify that it should apply to satellite cable programming. In this Court's opinion, it is the province of Congress or the FCC, if they so desire, to expand section 605(a) or to enact new legislation designed to prohibit the defendants' conduct. In short, the Court can find nothing in the language or intent of section 605 that prohibits the defendants' actions. For this reason, the Court holds that no violation of 47 U.S.C. § 605(a) has taken place, and judgment on this count shall be entered in favor of the defendants.

## C. MOTIONS FOR RECONSIDERATION

After the trial of this matter, both Snider and Cue moved the Court to reconsider its denial of their motions to file amended pleadings. The providence of these motions was discussed at trial, and the Court indicated at that time it would grant them. Therefore, plaintiff's Motion for Reconsideration (# 98), Defendant Cue's Motion for Reconsideration (# 96), plaintiff's Motion for Leave to File First Amended Complaint (# 49), and Cue

Paging Corporation's Motion for Leave to File Counterclaim (# 52) are granted. The Clerk is directed to file the First Amended Complaint and the Counterclaim.

The Court notes that plaintiff's amended complaint asserts an additional three counts: (1) breach of contract, (2) conversion, and (3) unjust enrichment. These three counts are asserted against defendant Cue only, and defendant Magic 105 is, thus, dismissed from the lawsuit. Defendant Cue's counterclaim also alleges three counts: (1) breach of contract, (2) tortious interference with contractual relations and business expectancy, and (3) unjust enrichment. The parties are directed to notify the Court in a joint response within twenty (20) days after the filing date of this order whether the new issues may be decided on the record as it exists or whether another trial is necessary. If the former is the case, the Court will devise a briefing schedule for the parties.

## IV. CONCLUSION

In sum, the Court finds that defendants have not violated 47 U.S.C. § 605. Therefore, Count I of plaintiff's complaint is dismissed. As to Count II of the complaint, plaintiff agreed to a dismissal with prejudice during the trial of the matter. Because no claims remain against it, defendant Magic 105 is dismissed from the lawsuit. However, the court will not enter a judgment under Fed.R.Civ.P. 54 at this time.

Additionally, the Court will grant the motions for reconsideration. The Clerk is directed to file Snider's amended complaint and Cue's counterclaim.

IT IS SO ORDERED.